**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**George E. WALKER,
Defendant-Appellant.**

**No. 79–1738.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 5, 1980.

Decided Aug. 17, 1981.

Rehearing and Rehearing En Banc
Denied Oct. 15, 1981.

As Amended Oct. 19, 1981.

Norman Sepenuk, Portland, Or., for defendant-appellant.

Margaret G. Halpern, U. S. Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before ALARCON and CANBY, Circuit Judges, and HOFFMAN *, District Judge.

WALTER E. HOFFMAN, District Judge:

Defendant appeals from a jury conviction for conspiring to defraud the United States by bid-rigging a timber sale by the United States Forest Service in violation of 18 U.S.C. § 371. The same jury acquitted him of a Sherman Act § 1 antitrust charge of conspiring to restrain trade in violation of 15 U.S.C. § 1 as to the same timber sales.[1] He was sentenced to a term of two years, but only required to serve 90 days and pay a $10,000 fine, with a five-year probationary period to follow his confinement.

Walker first argues that the indictment, which was returned on January 24, 1979, was barred the the applicable statute of limitations [2] as having been returned more than five years after the commission of the offense. He claims the defrauding offense was committed when he filed a false certificate that no bid-rigging had taken place in connection with his bid on the two timber sales in June, 1972. The conspiracy ended, he claims, when the Forest Service awarded Walker the two contracts in reliance upon the false representations in the certificates. The Government, on the other hand, sees the conspiratorial offense as being extended each time Walker cut timber, which was only finished in August and September, 1975, and paid off his co-conspirators, some of which payoffs occurred well within the five-year period. The second error Walker cites is unfair prejudice at trial as a result of alleged multiplicity in the conspiracy indictment. He contends that two conspiracies may not be alleged where only one agreement is involved, albeit to violate two distinct statutes. The Government answers that Walker cannot protest prejudice from multiplicity unless convicted on both counts and thereafter given cumulative sentences, and that, even if he could, the two conspiracy charges neither amounted to prosecutorial abuse nor were multiplicious where two specific conspiracy statutes were violated. We agree with the Government on both issues and uphold Walker's conviction based on our conclusion that the defrauding charge was not time-barred and that the indictment was not multiplicious.

On June 23, 1972, the Forest Service opened sealed bids from six companies or individuals on the timber to be cut from two tracts of land in Oregon. The bidders were Walker; the Murphy Company [Murphy], for whom Walker's co-defendant Smejkal acted as an agent; Coos Head Timber Company [Coos Head]; West Coast Orient Company [W.C.O.]; and two other companies not involved in this case. Each bid was accompanied by a Certificate of Independent Price Determination. All the written bids except Walker's were for the minimum acceptable price set by the Forest

---

* Honorable Walter E. Hoffman, Senior Judge, United States District for the Eastern District of Virginia, sitting by designation.

1. A codefendant, Smejkal, was acquitted of both charges.

2. 18 U.S.C. § 3282.

Service, and no oral bids were offered at the auction. Therefore, Walker's offer of five cents per thousand board feet over the minimum was successful. The Government contended that Walker rigged bids with three other bidders—Smejkal, Coos Head, and W.C.O.—and two who regularly bid for Port Orford cedar[3] but did not bid on the Sucker Creek and Tellim sales—Matthews and Ocean Terminals Company [O.T.]. Its contention was backed up by circumstantial evidence offered at trial of payments to these five companies and individuals, allegedly payoffs for their presale agreement with Walker that his would be the only bid over the minimum, thus forcing the Forest Service to sell the timber at an artificially deflated price.

The day after the sale Walker and Matthews entered into a joint-venture agreement to share all profits and costs of the two sales, but Walker failed to honor the agreement, instead sharing profits with Smejkal and selling all the Port Orford cedar to W.C.O. for resale to Japan. Walker's and Smejkal's profit-sharing agreement on the sales was dated three days before the actual sale. Walker had W.C.O. pay Murphy—the money actually went to Murphy's agent, Smejkal—$25 per thousand board feet cut on the two tracts, for a total of $100,000, as shown on Walker's statements to W.C.O. Matthews testified that Walker told him the payments were to keep Murphy from bidding at the two sales.

Walker sold the Douglas fir to Coos Head for $90 per thousand board board feet, $40 under its $130 market value. A W.C.O. official testified Walker said this procedure saved him from having to write checks to Coos Head for the $40 amount. Walker insisted that W.C.O. use O.T. for loading and storing the logs W.C.O. bought from him, even though O.T.'s charge was $23.50 per thousand board feet and W.C.O.'s usual log handler only charged $12.50. W.C.O. only agreed to do so on condition that the excess payments be subtracted from the sale price W.C.O. paid to Walker.[4]

## STATUTE OF LIMITATIONS

The general rule on when time limits begin to run on conspiracy charges was stated by the Supreme Court in *Grunewald v. United States*, 353 U.S. 391, 397, 77 S.Ct. 963, 970, 1 L.Ed.2d 931 (1957):

> [T]he crucial question in determining whether the statute of limitations has run is the *scope of the conspiratorial agreement,* for it is that which determines both the duration of the conspiracy, and whether the act relied on as an overt act may properly be regarded as in furtherance of the conspiracy. (Emphasis supplied)

The scope of Walker's agreement with his co-conspirators must be inferred from the circumstantial evidence, there being no direct testimony as to what was agreed upon.

---

**3.** Both tracts had unusually large quantities of Port Orford cedar, usually exported to Japan, and lesser amounts of Douglas fir.

**4.** Walker had several defenses to the inference of bid-rigging from these acts: He was known as an aggressive bidder likely to outbid his competitors. None of his competitors except O.T. was a regular exporter of Port Orford cedar and in a position to bid on two tracts this size. O.T. lacked the necessary Japanese backing for such a substantial amount of cedar. The profit-sharing agreement with Smejkal, they both claimed, was actually signed in July after the sale and backdated for tax purposes. The payments to Smejkal were Walker's part of a joint land purchase by Smejkal and Walker. Coos Head did not pay less than the mar-

ket value because the average price for Douglas fir in mid-1972 and the highest Coos Head would have paid was $90. O.T.'s high charge for log-handling was necessitated by extraordinary services and, even at that price O.T. could not make a profit and discontinued handling logs from the two sales in 1974. W.C.O. sold Walker the cedar because W.C.O. had always been Walker's backer for Port Orford cedar sales. Matthews' testimony was motivated by antagonism at being displaced by Smejkal as Walker's partner in the venture. Walker claimed he was considered highly generous and felt it made good business sense to share his good fortune in making such an excellent buy on the two sales with his competitors.

From that evidence[5] a jury could have concluded that one aim of the agreement was for Walker to repay each co-conspirator who agreed not to bid or to bid only the minimum, and, that being an aim of the conspiracy, that it lasted through the division of the excess profits Walker made on the sale among the co-conspirators.[6]

Walker argues that, as a matter of law, the essence of a conspiracy such as this one is the filing of a false statement to defeat a legitimate government function and thus his offense is not chargeable under § 371 as a conspiracy to defraud the United States, which charge he calls a ploy to apply a longer statute of limitations. He sees the criminal objective here as accomplished with the award to Walker in reliance on the filing of false certificates with the Forest Service. He cites as authority *Bridges v. United States*, 346 U.S. 209, 73 S.Ct. 1055, 97 L.Ed. 1557 (1953), in which the Court held the defendants' crime to be the substantive one, time barred, of obstructing the proper administration of naturalization laws by making false statements, not that of conspiracy to defraud the government under the predecessor statute to § 371. "The use in Count I of language copied from the second [defrauding] clause of the conspiracy statute merely cloaks a factual charge of conspiring to cause, or knowingly to aid, Bridges to make a false statement. . . .", id. at 224, 73 S.Ct. at 1063. Fraud was not "an essential ingredient of the offense of making a false material statement under oath in a naturalization proceeding," *id.* at 222, 73 S.Ct. at 1062 and thus Bridges could not be charged with defrauding the government in violation of § 371. In addition, the Wartime Suspension of Limitations Act that the government sought to apply to toll the time period for the indictment only applied "where the fraud [was] of a pecuniary nature or at least of a nature concerning property." *Id.* at 215, 73 S.Ct. at 1059.

■ The Court later explained its decision in *Bridges* as based on an unwillingness to allow prosecutorial sleight-of-hand. In *Dennis v. United States*, 384 U.S. 855, 863, 86 S.Ct. 1840, 1845, 16 L.Ed.2d 973 (1966), the Court said, "The decision there [in *Bridges*] did not turn upon construction of § 371." The sole purpose of characterizing the charge in Bridges as a § 371 conspiracy to defraud was "to revive a stale prosecution" by use of the Wartime Act, which was only intended to suspend time limits on pecuniary fraud or fraud on property. *Id.* The defendants in *Dennis*, in contrast, who conspired to file false non-Communist affidavits with the National Labor Relations Board in order to be able to employ its services, were properly charged under § 371 with conspiracy to defraud the government, although they also could have been indicted for a § 371 conspiracy to violate 18 U.S.C. § 1001, forbidding the filing of false statements with a government agency. *Id.* at 863–64 n. 8, 86 S.Ct. at 1845–46 n. 8. Both charges were applicable to defendants' conduct; the choice of a § 371 defrauding action was not an attempt to escape a time bar, as either action would have been timely as long as one overt act took place within the necessary time span. *Id.* As in *Dennis*, the fraud here involved a false statement to a government agency and the later enjoyment of the fruits of that deception and was properly charged as a § 371 fraud. Therefore, the last overt act of this conspiracy was not the filing of the false certificates, because the agreement itself aimed beyond merely defeating the government

5. Circumstantial evidence included the profit-sharing agreement with and W.C.O.'s payments to Smejkal, the joint-venture agreement with Matthews, the sale of fir to Coos Head at less than market value, the excessively high log-handling payments to O.T., and the sale of the cedar to W.C.O.

6. The duration of a conspiracy for purposes of the statute of limitations is a fact question for the jury. *Koury v. United States*, 217 F.2d 387, 388 (6th Cir.1954). The jurors were told that Walker could only be found guilty of violating § 371 if they found the conspiracy continued after January 25, 1974.

process of competitive bidding and encompassed the ultimate objective of making excess profits to be shared among the co-conspirators. This reading of the extension of Walker's conspiracy is buttressed by the decision in *Bramblett v. United States*, 231 F.2d 489, 491 (D.C.Cir.), *cert. denied*, 350 U.S. 1015, 76 S.Ct. 658, 100 L.Ed. 874 (1956), in which the District of Columbia Circuit found a falsification scheme by a Congressman, charged under § 1001 forbidding false statements, did not end with the filing of false payroll records, but instead continued through each payment by the government in reliance on those false records. Even Judge Bazelon's dissent acknowledged that, had the defendant been charged under the broader defrauding statute involved here, he would have viewed the conspiracy as a continuing one. *Id.* at 493.

■ Walker also argues that the conspiracy would be seen as ending with the award under a test set by this court that " '[the] statute of limitations starts to run on the date of the last overt act alleged to have caused the complainant injury.' " *United States v. Charnay*, 537 F.2d 341, 354 (9th Cir.), *cert. denied*, 429 U.S. 1000, 97 S.Ct. 527, 50 L.Ed.2d 610 (1976). Under that test, the issue would be what was the last act that actually defrauded the United States. Walker sees it as the award to him at an artificially deflated price. We disagree. The injury, in our opinion, was not complete until Walker had cut the last timber, obtained title to it, paid the government a noncompetitive price for it, resold it an an excess profit, and split the excess with his co-conspirators. The very reason Walker was charged under the more all-encompassing defrauding statute, rather then for conspiracy to make false statement, was that the injury went beyond the government's reliance on a false statement. He defrauded the United States of a competitive price for its timber each time he took the later actions.

Walker also cites two other Supreme Court opinions stating that the life of a conspiracy is not prolonged by continuing cooperation of co-conspirators unless such is preplanned and necessary to the scheme's success.

> It is true that the unlawful agreement satisfies the definition of the crime, but it does not exhaust it. It also is true, of course, that the mere continuance of the result of a crime does not continue the crime. . . . But when the plot contemplates bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirators to keep it up, and there is such continuous coöperation, [the conspiracy continues].

*United States v. Kissel*, 218 U.S. 601, 607, 31 S.Ct. 124, 125, 54 L.Ed. 1168 (1910). (Conspiracy to eliminate competitor by cooperative use of voting rights continued as long as those rights were exercised to drive competitor out of business). The Court elaborated on the same theme in *Fiswick v. United States*, 329 U.S. 211, 216, 67 S.Ct. 224, 227, 91 L.Ed. 196 (1946):

> Though the result of a conspiracy may be continuing, the conspiracy does not thereby become a continuing one. . . . Continuity of action to produce the unlawful result, or . . . "continuous coöperation of the conspirators to keep it up," is necessary.

Walker views the cutting, payment, resale, and division of profits on the timber as merely the continuing *result* of the conspiracy, but we believe the conspiracy was a continuing one within the meaning of *Kissel* and *Fiswick*. Without the continuing cooperation of his co-conspirators, bought by the payoffs to them in various forms, the scheme would have fallen apart. There was enough evidence for a jury to conclude that the agreement not to outbid Walker included a promised share in his profits. Had Walker failed to make an agreed payoff, a material element of the agreement

with the co-conspirators would have been breached.[7]

Walker next argues that the acts relied on to prolong the conspiracy—performance of his contract and division of the spoils— are analogous to acts of concealment, which do not ordinarily extend the life of a conspiracy. All three types of acts are similar, he says, as they follow almost every conspiracy to defraud the government and do not further the main objectives of the conspiracy. He relies on *Grunewald v. United States*, 353 U.S. 391, 405, 77 S.Ct. 963, 974, 1 L.Ed.2d 931 (1957), in which the Court refused to find a conspiracy to defraud the Internal Revenue Service by obtaining "no prosecution" rulings had been extended by later attempts to conceal the crime, which attempts had not formed part of the conspiratorial agreement.

> We cannot accede to the proposition that the duration of a conspiracy can be indefinitely lengthened merely because the conspiracy is kept a secret, and merely because the conspirators take steps to bury their traces, in order to avoid detection and punishment after the central criminal purpose has been accomplished.
>
> By no means does this mean that acts of concealment can never have significance in furthering a criminal conspiracy. But a vital distinction must be made between acts of concealment done in furtherance of the *main* criminal objective of the conspiracy, and acts of concealment done after these central objectives have been obtained, for the purpose only of covering up after the crime.

*Id.*

We do not agree with Walker that the acts of contract performance and division of profits are analogous to coverup activities and thus barred by *Grunewald.* However,

even if we were to accept this tortured analogy and apply the *Grunewald* test, those acts formed part of the conspiracy because they did not *follow* the accomplishment of its central criminal objectives but rather were acts in *furtherance* of those aims, viz, obtaining and dividing the excess profits made on the timber. Walker's definition of the objective of the conspirators as limited to obtaining the award from the Forest Service is far too narrow.

Walker primarily relies on three cases for his contention that dividing the spoils is not a major aim of such a conspiracy. None of them is persuasive. In *United States v. Great Western Sugar Co.*, 39 F.2d 152, 154 (D.Neb.1930), the conspiracy to restrain trade by closing the market to a potential competitor ended when farmers signed long-term contracts to sell sugar at a high price to defendant sugar refiner, thus ending the price war. However, both the statute and conspiracy were different in *Great Western* than here; once the contracts with the farmers were signed, the predatory pricing had accomplished its purpose of shutting out a potential competitor, which was at once the aim of the conspiracy and one of the major evils at which Sherman § 1 was directed. In contrast, the goal of Walker's conspiracy, and one of the evils § 371 was designed to protect against, was defrauding the United States of money; that goal was not fully achieved until all the timber had been cut and the government paid at a noncompetitive price. The Eighth Circuit case cited by Walker is also inapposite. In *Lonabaugh v. United States*, 179 F. 476, 481 (8th Cir.1910), the conspiracy to defraud the government was over when the government accepted applications for land patents that falsely stated the applicants wanted the land for themselves, not later when defendants deeded the land to

---

7. Had one of the co-conspirators informed the government of the bid-rigging, the government probably could have rescinded the contract. *See United States v. 1,557.28 Acres of Land . . .*, 486 F.2d 445, 447 (10th Cir.1973) (District Court's rescission of offer to sell land to government upheld, where rescission was granted because of fraud by government's agent because under federal law, "[w]here a party can show that he has been fraudulently induced to enter into a transaction, he may then void that transaction.").

their corporate co-conspirator. It is noteworthy, however, that the point at which the court saw the conspiracy as ending was when title to the land passed. The Court asked: "But were [the overt acts] done to effect the object of the conspiracy; that is to defraud the United States of the possession and title?", *id.* at 479, and concluded, "[t]he object of the conspiracy was effected when the title passed from the United States, . . . ." *id.* at 481. By that reasoning the conspiracy here did not end until the timber was cut, at which time possession and title to the timber passed to Walker as per the agreement of sale. Walker's reliance on *Rose v. St. Clair*, 28 F.2d 189 (W.D.Va.1928), is even more misplaced. The court in *Rose* held a conspiracy to violate the statute forbidding interstate transport of prize fight films for exhibition ended with the completion of the illegal act itself, which was the crossing of state lines, and did not continue through the exhibition, which was not expressly outlawed. *Id.* at 192. The court distinguished the illegal object of the conspiracy, the transport, from its ultimate purpose, the exhibition, finding the latter was not encompassed within the conspiracy. *Id.* at 191. That holding, even if still viable,[8] is not persuasive here, since here the illegal object of defrauding the government was not accomplished until all the timber had been cut and paid for at a noncompetitive price.

Several decisions by this court are more on point. A conspiracy to defraud the United States by means of collusive bids on a contract to supply coal to the Army lasted past the award to defendants, continuing at least until the defendants cashed the government's checks. *Houston v. United States*, 217 F. 852, 859 (9th Cir.1914), *cert. denied*, 238 U.S. 613, 35 S.Ct. 284, 59 L.Ed. 1490 (1915). "The bids were but a portion of the means whereby the unlawful purpose was to be accomplished. The indictment charges, not that the object of the conspiracy was to interpose collusive and fraudulent bids, but that it was to defraud the United States of the money that should be paid as the purchase price of coal." *Id.* at 856. In the instant case, the government as seller was not paid by Walker until well within the statutory period, and therefore those payments are part of the conspiracy under the reasoning in *Houston*. Similarly, a securities fraud conspiracy continued beyond the sale of land contracts to investors and included the mailing of the last monthly payment check because those payments represented an integral part of the fraudulent transaction as an attempt to lull investors. *United States v. Brown*, 578 F.2d 1280, 1285 (9th Cir.), *cert. denied*, 439 U.S. 928, 99 S.Ct. 315, 58 L.Ed.2d 322 (1978). In determining the duration of a conspiracy for the purpose of admitting statements of co-conspirators, this court determined that the division of the profits was part of a conspiracy to rob a bank, given that the disposal of the fruits of the robbery would be one of the logical objectives of such a conspiracy.[9] *Atkins v. United States*, 307 F.2d 937, 940 (9th Cir.1962). This court wrote, "The criminal aim of the conspiracy was not to commit the robbery, but to make a profit by illegal means." Id. (Admissibility of co-conspirator's statements). *Accord, United States v. James*, 494 F.2d 1007, 1026 (D.C.Cir.), *cert. denied*, 419 U.S. 1020, 95 S.Ct. 495, 42 L.Ed.2d 294 (1974) (Threatening statement made by "collection agent" for seller to delinquent narcotics purchaser was admissible because obtaining illegal gain was normally one object of such a conspiracy).

Several courts have held that conspiracies can last beyond the attaining of their major

---

**8.** The court in *Rose* found that Congress did not intend to outlaw exhibition of prize fight films and, even had such been its purpose, had "doubt as to the constitutional power of Congress to forbid the public exhibition of pictures of prize fights in the states . . .", even after they had traveled in interstate commerce. *Id.* at 192.

**9.** The court's alternative theory was that knowingly concealing stolen money was also a criminal action itself, as well as an overt act forming an integral part of a conspiracy to rob a bank.

objective to the achievement of other subsidiary objectives afterward. For example, the Seventh Circuit has written:

> But the fact that the "central objective" of the conspiracy has been nominally attained does not preclude the continuance of the conspiracy. Where there is evidence that the conspirators originally agreed to take certain steps after the principal objective of the conspiracy was reached, or evidence from which such an agreement may reasonably be inferred, the conspiracy may be found to continue.

*United States v. Hickey,* 360 F.2d 127, 141 (7th Cir.), *cert. denied,* 385 U.S. 928, 87 S.Ct. 284, 17 L.Ed.2d 210 (1966), (*citing Atkins, supra*). *See also Koury v. United States,* 217 F.2d 387, 388 (6th Cir.1954) ("A conspiracy is not ended by the illegal transportation of a stolen car when the fruits of the transportation are yet to be obtained and divided by the conspirators."); *McDonald v. United States,* 89 F.2d 128 (8th Cir.), cert. denied, 301 U.S. 697, 57 S.Ct. 925, 81 L.Ed. 1352 (1937) (Kidnapping agreement comprehended division of ransom money in spendable form; therefore, the act of exchanging marked money for unmarked was part of conspiracy). Thus, even if the central objective of the conspiracy in this case was to get the award, if the conspirators *also* planned to divide the profits, the conspiracy lasted until that additional objective was accomplished. That seems to be one of the theories applied in *United States v. Inryco, Inc.,* 642 F.2d 290 (9th Cir.1981), in which this court held that a Sherman § 1 bid-rigging conspiracy could embrace not just the principal award but the later subcontracting awards as payoff to the subcontractor for refraining from bidding on the overall contract. The district court's analogy to a bank robbery was rejected. The indictment should not have been dismissed as time-barred because a jury could infer that one of the additional objectives of the conspiracy was to give the subcontractor a non-competitive advantage in the subcontract market by prearranging awards to him. The court's opinion was based in part on the anticompetitive nature of the subcontracting awards themselves; it stated that any act in furtherance of the agreement that tended to suppress or restrain trade would extend the time period. Walker would read that to mean that only later anti-competitive acts could have extended the conspiracy at issue in this case, but his reasoning is faulty in two respects. First, the court had other reasons for finding the subcontracting award was a payoff and part of the conspiracy: among other things, it furthered the goals of the conspiracy and only occurred after the main award was made, both of which also apply here. Second, if the later acts in *Inryco* furthered a restraint-of-trade conspiracy because they tended to suppress trade, so by analogy later actions here extended a § 371 defrauding conspiracy to the extent that they tended to defraud the government. Cutting the timber and paying the Forest Service an anticompetitive price are acts that tend to defraud the government and thus form part and parcel of a § 371 conspiracy.

In sum, under all of the theories for measuring the duration of a conspiracy, the one at issue here lasted well past the award to Walker on June 23, 1972, and therefore the charge against him was not time-barred.

*Multiplicity*

■ Walker's second assignment of error is that the indictment charging him with both conspiracy to restrain trade and conspiracy to defraud the United States was multiplicious because both counts were based on the same conspiratorial bid-rigging agreement, even though the agreement was to violate several statutes. He admits that a defendant can only complain of multiplicity if he is thereby prejudiced, such as by receiving consecutive sentences

for multiplicious charges.[10]  *United States v. Davis*, 548 F.2d 840, 845 (9th Cir.1977). But he contends that the use of the two conspiracy counts here for one bid-rigging agreement prejudiced him by either confusing the jury into an inconsistent verdict or encouraging them to reach a compromise verdict. A jury, however, is permitted to reach an inconsistent verdict. *Dunn v. United States*, 284 U.S. 390, 393, 52 S.Ct. 189, 190, 76 L.Ed. 356 (1932). But the issue of prejudice need not even be reached because the indictment was not multiplicious.

■■ The starting point for determining if a single act constitutes two offenses, which is within the power of Congress to ordain, is whether each requires proof of a fact that the other does not, the test of statutory construction set out in *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932).[11] Under that test, Sherman § 1 conspiracy and § 371 fraud conspiracy are two separate offenses. Walker's claim that the only distinction between the two is that the former requires a connection with interstate commerce, a purely jurisdictional requirement, is not correct. An overt act is required for a § 371 conviction, *United States v. Del Toro*, 513 F.2d 656, 664 (2d Cir.), *cert. denied*, 423 U.S. 826, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975), but not for a Sherman § 1 violation, *Leyvas v.*

*United States*, 371 F.2d 714, 717 n. 14 (9th Cir.1967). *See generally Mowery v. Standard Oil Co. of Ohio*, 463 F.Supp. 762, 765–66 (N.D.Ohio 1976), *aff'd*, 590 F.2d 335 (6th Cir.1978) (elements of a Sherman § 1 conspiracy); *Del Toro, supra*, 513 F.2d at 663–64 (elements of a § 371 fraud conspiracy). The two statutes, besides requiring proof of a fact that the other does not, "serve separate and distinct purposes." *United States v. Stearns*, 550 F.2d 1167, 1172 (9th Cir. 1977). Sherman § 1 is aimed at avoiding collusive activity to restrain trade; the United States need not be the victim. In contrast, § 371 forbids fraud practiced against any federal government agency. Because the essence of one offense is anti-competitive activity and of the other, deceptive acts,[12] each of which "impose[s] diverse social harms," *Albernaz v. United States*, 450 U.S. 333, 343, 101 S.Ct. 1137, 1144, 67 L.Ed.2d 275 (1981), we conclude that the two charges are not multiplicious.

As in *Albernaz*, our conclusion as to congressional intent "is reinforced by the fact that the two conspiracy statutes are directed to separate evils." *Id.*

Walker argues, however, that *Blockburger* is not applicable to multiple conspiracy charges based on the same agreement, which he sees as governed by *Braverman v. United States*, 317 U.S. 49, 63 S.Ct. 99, 87

10. Since Walker was acquitted of the Sherman § 1 count and convicted of the § 371 fraud count, he received only one sentence.

11. This test had been used earlier, e. g., *Gavieres v. United States*, 220 U.S. 338, 342–43, 31 S.Ct. 421, 422, 55 L.Ed. 489 (1911), but it is usually called the *Blockburger* test. Walker claims that this "same evidence" test is too narrow for judging the multiplicity of conspiracy charges, calling our attention to *United States v. Castro*, 629 F.2d 456, 461 (7th Cir. 1980), which looked beyond the test to other factors for narcotics conspiracy charges. However, *Castro* was decided before the recent Supreme Court decision in *Albernaz v. United States*, —— U.S. ——, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981), which looked to whether each statute required the "same evidence" and whether Congress intended to protect against separate social evils with two conspiracy statutes, the two-part analysis we apply here.

12. Walker's protest is similar to that made unsuccessfully, in *United States v. Azzarelli*, 612 F.2d 292 (7th Cir.1979), *cert. denied*, 447 U.S. 920, 100 S.Ct. 3010, 65 L.Ed.2d 1112 (1980). The Seventh Circuit upheld convictions for anti-trust conspiracy and mail fraud based, as was Walker's on bid-rigging and false statements of no price collusion. That court held that bid-rigging conduct was not only anti-competitive but also fraudulent, and thus could violate statutes forbidding each type of conduct. *Id.* at 298. The facts and the two social ills attacked by the statutes are almost identical to those here; the only difference is *Azzarelli* involved one conspiracy and one substantive offense and this case deals with two conspiracies.

L.Ed. 23 (1942). In *Braverman* the defendant was charged under the general conspiracy portion of § 371—which forbids conspiracy "to commit any offense against the United States"—of conspiring to violate several Internal Revenue Code provisions. The Court held that one agreement, even though to violate several statutes, does not constitute more than one offense. *Id.* at 52–54, 63 S.Ct. at 101–104. "The single agreement is the prohibited conspiracy, and however diverse its objects it violates but a single statute, § 37 of the Criminal Code [now 18 U.S.C. § 371]. For such a violation, only the single penalty prescribed by the statute can be imposed." *Id.* at 54, 63 S.Ct. at 102. Where one agreement violates both the § 371 *general* conspiracy section and a specific conspiracy statute forbidding the same general conduct, the prohibitions on multiplicity equally applies. *United States v. Mori,* 444 F.2d 240, 244–45 (5th Cir.), *cert. denied,* 404 U.S. 913, 92 S.Ct. 238, 30 L.Ed.2d 187 (1971). This court adopted that view in *United States v. Marotta,* 518 F.2d 681, 684 (9th Cir.1975): "We adhere to the reasoning in *Mori* in so far as it holds that where specific conspiracy statutes have been enacted, Congress intended to replace and not supplement the general conspiracy statute." [13] The situation is different where, as in *Marotta,* a defendant violates "two specific conspiracy statutes." *Id.* (Upholding convictions for conspiracy to import marijuana and conspiracy to distribute marijuana).[14] The result in *Marotta* was explained: "Granting that appellant was engaged in a single conspiracy with dual criminal objects, this court finds that Congress fully intended to permit punishing

such conspiracies twice as severely as those which embraced only one of the specified criminal objects." *Id.* at 685. The holding in *Marotta* was in line with the distinction drawn by the Supreme Court earlier in *Braverman, supra,* 317 U.S. at 54, 63 S.Ct. at 102, and reaffirmed in *American Tobacco Co. v. United States,* 328 U.S. 781, 787–88, 66 S.Ct. 1125, 1128, 90 L.Ed. 1575 (1946), that multiplicity would not be found where a single agreement violated two separate and distinct conspiracy statutes. *American Tobacco* upheld convictions for conspiracy to restrain trade, Sherman § 1, and conspiracy to monopolize trade, § 2 Sherman, though both were based on a single conspiratorial agreement.

Walker insists that the results in *Marotta* and *American Tobacco* are not applicable here because he was not charged under two *specific* conspiracy statutes but rather one specific statute, Sherman § 1, and a broad conspiracy statute, § 371. However, his analogy to the forbidden double use of the *general* conspiracy clause in § 371 and a specific conspiracy statute outlawing the same conduct, relying on *Marotta* and *Mori,* is inapposite. Defendant in *Mori* was charged under the statute forbidding conspiracy to import narcotics and also under the § 371 general clause with conspiracy to violate a federal law, to-wit, that forbidding the importation of narcotics. *Mori's* indictment was clearly multiplicious. But Walker was not charged with Sherman § 1 conspiracy and § 371 conspiracy to violate a federal statute, to-wit, that forbidding the restraint of trade. Instead he was indicted under another clause of § 371: not the

---

**13.** *See also United States v. Rose,* 570 F.2d 1358, 1362–63 (9th Cir.1978) (Multiplicious to sentence defendant consecutively for both making a false statement, in violation of 18 U.S.C. § 1001, and importing merchandise into the United States by means of a false statement, forbidden by 18 U.S.C. § 542, where both were based on a single false statement to customs officials that defendant only had two cameras to declare).

**14.** The Fifth Circuit followed *Marotta's* interpretation of those two statutes, *United States*

*v. Houltin,* 525 F.2d 943, 951 (5th Cir.1976), *vacated on other grounds and cert. denied on that ground,* 429 U.S. 1034, 97 S.Ct. 725, 50 L.Ed.2d 745 (1977), a holding recently made by the Supreme Court, *Albernaz, supra. See also United States v. James,* 494 F.2d 1007, 1025–26 (D.C.Cir.), *cert. denied,* 419 U.S. 1020, 95 S.Ct. 495, 42 L.Ed.2d 294 (1974) (Convictions for conspiracy to receive and conceal narcotics and conspiracy to sell narcotics upheld); *see generally, Gore v. United States,* 357 U.S. 386, 390–91, 78 S.Ct. 1280, 1283, 2 L.Ed.2d 1405 (1958).

general conspiracy clause involved in *Mori* but a separate clause forbidding defrauding the government. True, the defrauding clause is also broad and indictments for § 371 defrauding should be carefully scrutinized to avoid overbroad application. *Dennis v. United States*, 384 U.S. 855, 860, 86 S.Ct. 1840, 1843, 16 L.Ed.2d 973 (1966); *United States v. Shoup*, 608 F.2d 950, 955–56 (3d Cir.1979); *United States v. Rosenblatt*, 554 F.2d 36, 40 (2nd Cir.1977). In our opinion, however, the agreement here, as in *Dennis*, fit within the conduct proscribed by § 371 as defrauding the United States and it was not multiplicious to charge both § 371 fraud on the government and Sherman § 1 restraint of trade, as they represented distinct offenses, which Congress meant to punish separately.

AFFIRMED.