## UNITED STATES of America

### v.

## SEVILLE INDUSTRIAL MACHINERY CORPORATION, et al., Defendants.

### Crim. No. 87–31.

United States District Court,
D. New Jersey.

Jan. 21, 1988.

Sentencing Opinion Oct. 4, 1988.

Todd P. Leff, Antitrust Div., U.S. Dept. of Justice, Philadelphia, Pa., for the United States.

Stanley A. Teitler, P.C., New York City, for defendants Yoder Machinery Co. and Timothy A. Yoder.

Andrew K. Ruotolo, Jr., Mountainside, N.J., for defendants Carney Machinery, Inc. and Michael J. Carney.

J. Michael Farrell, Sleet & Farrell, Woodbury, N.J., for defendants Martin Mayerson and Mayerson Machinery Mart, Inc.

Barry I. Fredericks, Hackensack, N.J., for defendants Bernard B. Seville and Seville Industrial Machinery Corp.

Larry J. Silverman, Budd, Larner, Gross, Picillo, Rosenbaum, Greenberg & Sade, New York City, for defendants Henry I. Zeisel and Zeisel Machinery Co., Inc.

Michael R. Koblenz, Mound, Cotton & Wollan, New York City, for defendant R.M.E. Machinery Sales, Inc.

Wendell B. Alcorn, Cadwalader, Wickersham & Taft, New York City, for defendants Norman Finkelstein and All State Machinery Corp.

Brian J. Neary, Hackensack, N.J., for defendant Eugene Bell and Globe Metal Working.

Richard A. Norris, Norris, McLaughlin & Marcus, Somerville, N.J., for defendant Johnson Machinery Co.

Charles H. Nugent, c/o F. Hartman, Morrestown, N.J., for defendants Albert S.

Hernberg and Martin Electric Tool & Salvage Co., Inc.

Anthony Napolitano, Probstein & Napolitano, New York City, for defendant Centre Machinery Co., Inc.

Mark A. Klugheit, Dechert, Price & Rhods, Philadelphia, Pa., for defendants Joseph Weiswasser and Metalworking Equipment Co.

Thomas J. Curley, Jr., Goodwin, Procter & Hoar, Boston, Mass., for defendant Wigglesworth Machinery Co.

Edward A. Geltman, Squire, Sanders & Dempsey, New York City.

Beatriz Souviron D'Amico, Federal Defender, Office of the Federal Public Defender, Newark, N.J.

## OPINION

SAROKIN, District Judge.

The defendants in this criminal antitrust case move for dismissal of the indictment. The motion is denied.

## BACKGROUND

On September 10, 1987, a grand jury indicted nineteen corporate and seventeen individual defendants [1] for violating federal antitrust law and for conspiring to defraud the United States. The court has accepted guilty pleas from, and sentenced, a number of the defendants. The remaining defendants now move to dismiss the indictment for legal insufficiency. Because defendants contend that the facts alleged in the indictment, even if proved beyond a reasonable doubt, do not charge a violation of federal law, the court must review the allegations.

On December 2, 1985, a company called S & S Corrugated was declared bankrupt under Chapter 7 of the bankruptcy code. The United States Bankruptcy Court for the Southern District of New York entered an order on February 12, 1986 authorizing the trustee to hold an auction of S & S Corrugated's commercial equipment. That auction, administered by the Daley–Hodking Corporation under the trustee's supervision, occurred on March 11, 1986. The bankruptcy court entered an order on March 14 confirming and approving the auction and authorizing the trustee to execute documents consummating the sale.

According to the indictment, the defendants agreed before the public auction not to bid against one another, and implemented their plan at the auction. Then, immediately after the auction, the defendants held their own private auction of the equipment they had just purchased. Once all items were resold at the private auction, the defendants divided up and shared the difference between the higher prices paid at the private auction and the lower prices paid at the public bankruptcy auction. That difference was in excess of $75,000.

Count One of the indictment charges a violation of the Sherman Act, 15 U.S.C. § 1. The defendants' plan, according to the indictment, was a "combination and conspiracy in unreasonable restraint of interstate trade and commerce." It had the effects of restraining and eliminating competition among the defendants, enabling the defendants to pay artificially low prices for equipment at the public auction, and depriving S & S Corrugated and its creditors of full compensation and the benefits of free competition.

Count Two charges a violation of 18 U.S.C. § 371, which forbids conspiracies to defraud the United States. The theory of the indictment is that the defendants defrauded the United States "by impeding, impairing, obstructing and defeating the lawful government function of the Bankruptcy Court in the due administration and enforcement of the Bankruptcy Code," and by deceiving the bankruptcy court into believing that the bids submitted at the auction were products of full and fair competition. The indictment charges the commission of a large number of overt acts in furtherance of the conspiracy, including defendants' attendance at the auction, agreement not to bid competitively, agreement to rebid privately any item bought at the public auction, attendance at the private auction, bidding at the private auction, payment for items, and sharing of the second auction's profits.

## DISCUSSION

Moving to dismiss the indictment in its entirety, the defendants now argue that the indictment fails to charge a violation of 15 U.S.C. § 1 or of 18 U.S.C. § 371, that the counts of the indictment are multiplicitous, and that the indictment represents an impermissibly selective prosecution. The court considers each contention in turn.

1. The nineteen corporate defendants are dealers of commercial equipment. Most of the seventeen individual defendants are top officers or employees of the corporate defendants.

I. *The Sherman Act*

A. Bid Rigging as a Per Se Violation

██ Under 15 U.S.C. § 1, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." As written, the Sherman Act is of extraordinary breadth. Indeed, it would appear to render illegal even the simplest commercial contract, since the contracting parties' agreement to trade with one another entails, for the purposes of their transaction, an implicit agreement to trade with no other. Despite the Act's breadth, the Supreme Court has upheld the Sherman Act over the objection that it is unconstitutionally vague. *See Nash v. United States*, 229 U.S. 373, 33 S.Ct. 780, 57 L.Ed.1232 (1913).

The Court, however, has also narrowed the reach of the Sherman Act to restraints of trade which are unreasonable:

> [Section 1 of the Act] necessarily called for the exercise of judgment which required that some standard should be resorted to for the purpose of determining whether the prohibition contained in the statute had or had not in any given case been violated. Thus not specifying, but indubitably contemplating and requiring a standard, it follows that it was intended that the *standard of reason* which had been applied at the common law and in this country in dealing with subjects of the character embraced by the statute was intended to be the measure used for the purpose of determining whether in a given case a particular act had or had not brought about the wrong against which the statute provided.

*Standard Oil Co. v. United States*, 221 U.S. 1, 60, 31 S.Ct. 502, 516, 55 L.Ed. 619 (1911) (emphasis added). Applying this "rule of reason" over the years, the courts became so familiar with certain patterns of anticompetitive business conduct that they began to apply to those patterns conclusive presumptions of unreasonableness. *See Northern Pacific Railway v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958) ("there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use"). Application of this conclusive presumption of unreasonableness to certain anticompetitive behavior has become known as the *"per se* doctrine." *See also United States v. Trenton Potteries*, 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927).

██ It is beyond question that bid rigging is a *per se* violation of the Sherman Act. *See, e.g., United States v. H & M, Inc.*, 565 F.Supp. 1, 2 (M.D.Pa.1982) (bid rigging is a *"per se* violation[ ] which go[es] to the heart of the Sherman Act"); *United States v. Koppers Co.*, 652 F.2d 290, 294 (2d Cir.1981), *cert. denied*, 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 617 (1981); *United States v. Brighton Building and Maintenance Co.*, 598 F.2d 1101, 1106 (7th Cir.1979), *cert. denied*, 444 U.S. 840, 100 S.Ct. 79, 62 L.Ed.2d 52 (1979); *United States v. Portsmouth Paving*, 694 F.2d 312, 317 (4th Cir.1983); *United States v. Rubbish Removal, Inc.*, 602 F.Supp. 595, 602 (N.D.N.Y.1984). Indeed, "in cases involving behavior such as bid rigging, which has been classified by courts as a *per se* violation, the Sherman Act will be read as simply saying: 'An agreement among competitors to rig bids is illegal.'" *United States v. Koppers Co.*, 652 F.2d at 294 (quoting *United States v. Brighton Building*, 598 F.2d at 1106).

Defendants attempt to distinguish their alleged behavior from classic bid rigging on the grounds that their alleged scheme involved no pre-auction fixing of prices and allowed for unfettered competition at the second, private auction. However, neither of these features, even if true, removes the alleged scheme from the domain of the *per se* violation. In the first place, courts have repeatedly held that a simple agreement not to bid is itself a *per se* antitrust violation, even in the absence of prior price fixing. "[W]here two or more persons agree that one will submit a bid for a

project higher or lower than the others *or that one will not submit a bid at all,* then there has been an unreasonable restraint of trade which violates the Sherman Antitrust Act." *United States v. W.F. Brinkley and Son,* 783 F.2d 1157, 1161 (4th Cir.1986) (emphasis added). *See also United States v. Portsmouth Paving,* 694 F.2d 312, 325 (4th Cir.1982) ("[a]ny agreement between competitors pursuant to which contract offers are to be submitted to *or withheld from* a third party constitutes bid rigging *per se* violative of 15 U.S.C. § 1" (emphasis added)); *Swift & Co. v. United States,* 196 U.S. 375, 400, 25 S.Ct. 276, 281, 49 L.Ed. 518 (1905) ("[t]he defendants cannot be ordered to compete, but they properly can be forbidden to give directions or to make agreements not to compete").

More importantly, the alleged scheme of the defendants is indistinguishable from schemes which courts have held *per se* violative of the Sherman Act. In *Addyston Pipe & Steel Co v. United States,* 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899), six manufacturers of cast-iron pipe formed an "association" to protect themselves from the adverse effects of the competition that normally existed between them. The association first divided their sales region into "pay" territory, in which each association member had to pay a bonus to the other members for his sales, and "free" territory, in which the members could sell freely without paying a bonus. However,

> [t]he system of bonuses, as a means of restricting competition and maintaining prices, was not successful. A change was therefore made by which prices were to be fixed for each contract by the association, and, except in reserved cities, *the bidder was determined by competitive bidding of the members, the one agreeing to the highest bonus for division among the others getting the contract.*

*United States v. Addyston Pipe & Steel Co.,* 85 F. 271 (6th Cir.1898) (emphasis added), *mod. and aff'd,* 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899). In other words, the members of the association bid for the right to be the low bidder, and the association split the premium that each member was willing to pay for the advantage of no competition from other association members. The scheme in *Addyston Pipe* is therefore the mirror image of the alleged scheme of the defendants in this case; the only important distinction is that the *Addyston Pipe* conspirators competed *before* the public bidding, while these defendants allegedly competed *after* the public bidding.

The Supreme Court held that the association's scheme was an illegal combination in restraint of trade. In doing so, the Court emphasized that the illegality of the association's activity flowed from the scheme's effect not only on the actual public bidding, but on the members' freedom to compete at that bidding:

> It is also urged that as but one contract would be awarded for the work proposed at any place, and therefore only one person would secure it by virtue of being the lowest bidder, the selection by defendants of one of their number to make the lowest bid as among themselves could not operate as any restraint of trade.... This takes no heed of the purpose and effect of the combination *to restrain the action of the parties to it so that there shall be no competition among them to obtain the contract for themselves.... It is the effect of the combination in limiting and restricting the right of each of the members to transact business in the ordinary way,* as well as its effect upon the volume or extent of the dealing in the commodity, that is regarded.

175 U.S. at 244–45, 20 S.Ct. at 108–09 (emphasis added). It is crucial to note that in *Addyston Pipe,* as in the case before the court, *there was free competition among the members of the association;* the Supreme Court did not view this private competition as salvaging the corrupt agreement. Similarly, this court cannot attach any legal significance to the defendants' post-auction competition. That competition has no effect whatever on the illegality of the agreement not to compete at the public auction.

*United States v. Walker,* 653 F.2d 1343 (9th Cir.1981), *cert. denied,* 455 U.S. 908, 102 S.Ct. 1253, 71 L.Ed.2d 446 (1982), is

another case which presents facts virtually indistinguishable from the case before the court. In *Walker*, the defendant made payments to a number of his competitors to prevent them from bidding competitively at a timber sale administered by the United States Forest Service. The defendant was convicted of conspiring to defraud the United States through bid rigging. The economic effect of the scheme in *Walker* is identical to the effect of the scheme charged in this case. Whether would-be competitors split the economic premium which results from restrained competition before or after the bidding process is a matter only of timing, not of legality. Both schemes are equally violative of the Sherman Act.

■ Any argument that the unlawfulness of the agreement not to bid competitively was cured by the defendants' alleged post-auction competition is refuted by *United States v. Bensinger Co.*, 430 F.2d 584 (8th Cir.1970). In *Bensinger*, a restaurant twice accepted bids for the sale and installation of a dishwasher. It rejected all of the bids received in the first round, and then accepted a bid after reopening the bidding process. The government prosecuted defendant for rigging bids at the *first* bidding. The defendant argued that it could not be convicted of rigging bids at the first bidding, since the restaurant rejected all of the rigged bids. The court rejected this argument. *Bensinger* therefore reinforces the proposition that a Sherman Act violation occurs when competitors agree to bid noncompetitively. Just as the *Bensinger* defendant could not escape criminal liability by the fortuity that its corrupt plan did not succeed, the defendants in this case cannot escape criminal liability by the fortuity that other innocent bidders attended the public auction or that the alleged co-conspirators valued the purchased equipment sufficiently to trigger competitive bidding at their private auction. Their alleged crime was nothing more and nothing less than their agreement not to compete.

**B. Mens Rea**

■ Defendants contend that the indictment fails to allege specific intent, and that this deficiency requires dismissal of the indictment. The answer to this contention is that the indictment's failure to allege specific intent is not a deficiency. In *United States v. United States Gypsum Co.*, 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978), the Supreme Court held that "action undertaken with *knowledge* of its probable consequences and having the requisite anticompetitive effects can be a sufficient predicate for a finding of criminal liability under the antitrust laws." 438 U.S. at 444, 98 S.Ct. at 2877 (emphasis added). The Court thus chose general intent as the *mens rea* standard for antitrust crimes, explicitly rejecting a specific intent standard. This court therefore concludes that the indictment adequately charges the requisite level of criminal intent by alleging an "agreement, understanding and concert of action" to refrain from bidding "for the purpose of purchasing commercial equipment at artificially low and noncompetitive prices." Indictment at ¶ 14.

## II. *Conspiracy to Defraud the United States*

■ Defendants attack Count Two of the indictment on the grounds that it fails to charge a violation of 18 U.S.C. § 371. That statute provides that

> [i]f two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

Defendants' theory is that their alleged scheme defrauded, if anyone, only the creditors of S & S Corrugated, but not "the United States or any agency thereof."

Defendants rely on two recent Supreme Court decisions: *McNally v. United States*, —— U.S. ——, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), and *Tanner v. United States*, —— U.S. ——, 107 S.Ct. 2739, 97 L.Ed.2d 90

**992**

(1987). In *McNally,* the Supreme Court resolved an issue long debated in the district and circuit courts by holding that the mail fraud statute, 18 U.S.C. § 1341, is "limited in scope to the protection of property rights," as opposed to the intangible right of the citizenry to good government. 107 S.Ct. at 2880. In *Tanner,* the Court held that a conspiracy to defraud a private entity that receives "financial assistance and some supervision" from the United States is not a conspiracy to defraud the United States under § 371. 107 S.Ct. at 2752–53.

Neither of these cases is of any assistance to defendants. Defendants argue that the indictment is prohibited by *McNally* because it charges a deprivation only of an intangible right to the integrity of the bankruptcy courts, rather than of a tangible property interest. However, the *McNally* opinion will not support such a contention. The statute at issue in that case was 18 U.S.C. § 1341, the mail fraud statute. The Supreme Court was careful to note in its opinion that the scope of the mail fraud statute is *narrower* than the scope of 18 U.S.C. § 371, the statute at issue in this case. 107 S.Ct. at 2881 n. 8. Indeed, the *McNally* Court *endorsed* the use of 18 U.S.C. § 371 against schemes directed at the deprivation of intangible rights to governmental integrity. *Id.* Defendants' reliance on *McNally* is therefore wholly misplaced. *See also Tanner v. United States,* 107 S.Ct. at 2751 ("the fraud covered by the statute 'reaches "any conpiracy for the purpose of impairing obstructing, or defeating the lawful function of any department of Government"'" (citations omitted)).

*Tanner* is of no greater help to defendants. In *Tanner,* the defendants fraudulently obtained a loan from a private bank. That loan was guaranteed by the federal Rural Electrification Administration. The government obtained an indictment of defendants for conspiring to defraud the United States by fraudulently procuring the loan. The Court held that the defrauded private bank did not, by virtue of a limited amount of supervision by a federal

agency, become "the United States or any agency thereof" for the purposes of § 371.

■ *Tanner* is readily distinguishable from the case before the court. In the first place, the target of the fraud in *Tanner* was a private intermediary between the government and the defendants. In this case, by contrast, the target of the alleged fraud was the government agency itself, which functioned as intermediary between the defendants and the private creditors. *See* Indictment, Count Two at ¶¶ 2, 3. More importantly, unlike the charge in *Tanner,* this indictment charges that the defendants directly impaired government agents in their carrying out of the bankruptcy court's lawful functions. A bankruptcy court is a unit of the United States District Court charged with jurisdiction of any case arising under the bankruptcy code. 28 U.S.C. § 151. A bankruptcy trustee is an agent and officer of the bankruptcy court. *See Callaghan v. Reconstruction Finance Corporation,* 297 U.S. 464, 468, 56 S.Ct. 519, 521, 80 L.Ed. 804 (1936); *Red Carpet Corporation v. Miller,* 708 F.2d 1576, 1579 (11th Cir.1983); *In re Power,* 115 F.2d 69, 72 (7th Cir.1940). In this case, the bankruptcy court is the actual seller of a debtor's property at a bankruptcy auction. *In re Blue Coal Corporation,* 59 B.R. 157, 160 (Bkrtcy.M.D.Pa. 1986). Furthermore, the bankruptcy trustee was appointed by the bankruptcy court and was explicitly authorized by bankruptcy court order to hold the auction of S & S Corrugated's equipment. Defendants' argument based on *Tanner* must therefore fail, since the alleged fraud in this case was perpetrated directly on an agency of the United States. Count Two of the indictment properly charges a violation of 18 U.S.C. § 371.

### III. *Multiplicity and Selectivity*

■ Defendants argue that the two counts of the indictment are multiplicitous and that the indictment itself represents an impermissibly selective prosecution. Both arguments are meritless.

■ Counts of a complaint are multiplicitous if each count requires proof of the

same facts as each other count. That is simply not the case here, for

> an overt act is required for a § 371 conviction, but not for a Sherman § 1 violation. The two statutes, besides requiring proof of a fact that the other does not, serve separate and distinct purposes. Sherman § 1 is aimed at avoiding collusive activity to restrain trade; the United States need not be the victim. In contrast, § 371 forbids fraud practiced against any federal government agency. Because the essence of one offense is anti-competitive activity and of the other, deceptive acts, each of which impose diverse social harms, ... the two charges are not multiplicitous.

*United States v. Walker*, 653 F.2d 1343, 1351 (9th Cir.1981), *cert. denied*, 455 U.S. 908, 102 S.Ct. 1253, 71 L.Ed.2d 446 (1982). The court finds the reasoning of *Walker* persuasive, and concludes that the two counts of the indictment are not multiplicitous.

██ A defendant claiming impermissibly selective prosecution by the government bears a heavy burden of proof. He or she must overcome the princple that "the choice of whom to prosecute and the strategy of prosecution are generally matters left wholly to the government's control." *United States v. Herman*, 589 F.2d 1191, 1210 (3rd Cir.1978), *cert. denied*, 441 U.S. 913, 99 S.Ct. 2014, 60 L.Ed.2d 386 (1979). Thus defendants must make the twin showing

> (1) that while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against [them], [they have] been singled out for prosecution, and (2) that the government's discriminatory selection of [them] for prosecution has been invidious or in bad faith, *i.e.*, based upon such impermissible considerations as race, religion, or the desire to prevent [their] exercise of constitutional rights.

2. Defendants have also moved for extensive discovery from the government. The court concludes, however, that the government is under no obligation to provide the defendants with any materials or information other than that

*United States v. Berrios*, 501 F.2d 1207, 1211 (2nd Cir.1974).

Defendants do not advance the slimmest piece of evidence suggesting bad faith in their prosecution. Nor have they identified others similarly situated who have not been proceeded against for the same conduct. Accordingly, the court must reject the contention that the indictment must be dismissed as the product of impermissibly selective prosecution.

## CONCLUSION

The court finds no deficiency in the indictment. Defendants' motion to dismiss it must therefore be denied.[2]

## SENTENCING OPINION

If the evidence presented in this case is indicative of the ethics of this or any segment of the business community, then we should weep for its existence and fear for its future.

A group of bidders at a bankruptcy auction formed a ring for the express purpose of eliminating competition and buying cheaply. After acquiring the items at extremely low prices, the members of the ring then conducted their own private auction. The monies received at the private auction over and above those bid at the public auction were divided among the ring members. In essence, the monies which should have and would have gone to the creditors in the bankruptcy proceeding were divided among the ring members. Even those who made no bid and bought nothing were compensated solely for not competing at the public auction.

The pursuit of greed did not end there however. Certain of the ring members proceeded to hold a second, secret private auction having excluded some of the lesser companies from the circle, thereby cheating their own partners. They, in turn, divided the additional proceeds derived at the sec-

which it must disclose under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Jencks Act, 18 U.S.C. § 3500(b), and F.R.Crim.P. 16, and that which it has already promised to disclose voluntarily.

**994**

ond private auction among the remaining members.

Defendants argue and the evidence presented indicates that this is a common and long standing practice. Some defendants seek to rationalize and justify it as a legitimate partnership or joint venture. It is, however, nothing but an illegal conspiracy to deprive the bankruptcy court of monies it otherwise would have received, if competitive bidding had not been suppressed and thwarted by this scheme.

The success of any public auction depends upon honest and competitive bidding. There may be occasions in which two or more persons may legitimately pool their resources in order to submit a bid. However, in this case the practice had no such legitimacy. It served merely to deprive the bankruptcy court of the benefit of such competitive bids and divert the benefits to the bidders who comprised the illegal ring. The ring members made no contribution to the ring other than their promise not to compete against other ring members at the public auction.

The problem of sentencing posed by this matter is particularly troublesome. The current debate over the constitutionality of the new sentencing guidelines does not challenge one of the underlying premises of the guidelines—that historically white collar criminals have been treated with far greater leniency than the poor and minorities who needed more and took less, but have been punished more harshly. These defendants are all businessmen, men with families, many educated, active in their communities in charities and good works.

In considering the appropriate sentences, the court explored whether it would be feasible to make the defendants account and pay over to the bankruptcy trustees the ill-gotten gains at these sales. However, it appears that most of those debtor estates have been long closed, and it would be virtually impossible to resurrect them and disburse the monies to the rightful recipients.

Absent that alternative the court considered fines, community service and imprisonment. Severe penalties seem appropriate here because of the blatant and continuous nature of the conduct. If this practice is as prevalent as is conceded, then firm measures are necessary to bring it to a screeching halt. The failure of the parties to recognize and acknowledge the evil of their conduct is as disturbing as the conduct itself.

In imposing sentences the court has individualized the sentences based upon the respective conduct and background of each defendant.