**UNITED STATES of America**

v.

**Thomas K. DOHERTY, Nelson E. Barner, Nicholas Salerno, Arthur J. Pino, Robert W. Clemente, Sr., John A. Deliere, and Frank Ray.**

**Crim. A. No. 86–240–Y.**

United States District Court,
D. Massachusetts.

July 22, 1987.

See also 675 F.Supp. 719.

Asst. U.S. Attys., Robert Mueller, and A. John Pappalardo, Boston, Mass., for plaintiff.

Thomas Troy, Reading, Mass., Thomas E. Finnerty, Boston, Mass., George Gormley, Boston, Mass., Frank Marchetti, Summerville, Mass., Thomas Noone, Salem, Mass., Richard Egbert, Boston, Mass., and Thomas May, Boston, Mass., for defendants.

## POST–TRIAL MEMORANDUM AND ORDER

YOUNG, District Judge.

On May 7, 1987, the jury returned its verdict in the above-captioned matter after a seventeen-week trial. The jury found Thomas K. Doherty, Nelson E. Barner, and Nicholas Salerno guilty on Count I, what this Court and the parties have denominated as the "general conspiracy" to commit mail fraud. Thomas K. Doherty also was found guilty on Count XI of racketeering.[1] Nelson E. Barner was also found guilty on Count II of perjury. The defendants Arthur J. Pino, Robert W. Clemente, Sr., and John A. Deliere were each found guilty of separate conspiracies to commit mail fraud on Counts III, V and VII, and VI, respectively. Prior to trial, three additional defendants, Gerald W. Clemente, Jr., Richard J. Madden, and Frank Ray, had entered pleas of guilty. Frank Ray pled guilty to conspiracy to commit mail fraud on Count III and to perjury on Count IV.[2]

At the close of the evidence and then again after the verdict the defendants who had gone to trial submitted motions for judgment of acquittal as well as motions for a new trial after the jury verdict. This Court, while recognizing that some of the legal issues raised were substantial, denied the defendants' requests for relief with the proviso that this opinion would follow to address the most significant issues. Subsequently, on June 12th and 19th, this Court imposed sentences of incarceration on each of the defendants but stayed the execution of the sentences imposed pending the resolution of the expected appeals from the jury verdict. See 18 U.S.C. § 3143(b).

The Court and its staff then turned their attention to the immediate needs of other, equally pressing cases. Due to the very real practical demands of another large scale criminal conspiracy case pending in the western section of this district, which followed on the heels of this present matter, the judgments against each defendant had not yet been entered when the Supreme Court announced its decision in *McNally v. United States,* —— U.S. ——, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). As a direct result of the wholly unexpected explication of the law of mail fraud set forth in that opinion, the defendants Thomas K. Doherty, Nelson E. Barner, Nicholas Salerno, Arthur J. Pino, Robert W. Clemente, Sr., and John A. Deliere now all renew their motions to dismiss the indictment or, alternatively, move that this Court grant them an acquittal or a new trial. Certain of these defendants also filed motions "to stay entry of judgment." Additionally, the defendant Frank Ray moves that the Court permit him to withdraw his guilty plea and then dismiss the indictment against him.

This Court immediately set the matters down for a hearing after which the motions were taken under advisement. This opinion deals with the issues created in the instant case by the Supreme Court's deci-

---

1. Thomas K. Doherty, along with his son, Michael J. Doherty, were found not guilty on Count VIII of conspiracy to commit mail fraud.

2. Neither Gerald W. Clemente, Jr. nor Richard J. Madden are presently before the Court with respect to any post-trial motions.

sion in *McNally,* as well as explaining the significant grounds for denial of the post-trial motions earlier filed.

## I. JURISDICTION OVER THE McNALLY ISSUES

As a threshold matter, the government opposes the Court's consideration of the defendants' renewed motions on the ground that this Court lacks subject matter jurisdiction. The government characterizes the defendants' filings as motions for arrest of judgment pursuant to Fed.R.Crim. P. 34. Not all of the defendants' submissions have been so entitled. Instead, defendants Deliere and Salerno specifically labeled one of their joint submissions of June 26th as a motion for reconsideration of the motion for judgment of acquittal and the motion to dismiss.[3]

The defendants' submissions entitled "motion to stay entry of judgment" are, in fact, motions for arrest of judgment that must be denied as untimely.[4]

The other motions, however, do not fall within the ambit of Rule 34. The defendants' motions that this Court reconsider its previous rulings on their motion to dismiss, motion for judgment of acquittal, and motion for a new trial, are better characterized as falling under Federal Rules of Criminal Procedure 12(b), 29, and 33. This Court has subject matter jurisdiction to entertain these motions.

██ The government's argument that the untimeliness of the motions creates a jurisdictional bar is ill applied to the circumstances of this case. The Court notes as an initial matter that while the Rules are quite specific as to the filing deadlines for Rules 29, 33, and 34, "[i]t is well-established that the failure of an indictment to state an offense is a fatal defect that may be raised at any time." *United States v. Watkins,* 709 F.2d 475, 478 n. 2 (7th Cir.

1983); *see* 1 C. Wright, *Federal Practice and Procedure* § 193, at 693–95 (1982) (noting that courts have considered Rule 12 as controlling Rule 34 on the question of the timing of a motion alleging failure of an indictment to state an offense). Even with respect to the renewed motions under Rules 29 and 33, however, the government is in error in arguing that this Court is somehow acting in contravention of Fed.R. Crim.P. 45 by further considering the motions sought to be renewed (and thus, in effect, enlarging the time in which arguments in support of those motions might be advanced). Rule 45 and the specific time constraints in Rules 29 and 33 do not address the present context, *viz.* where post-trial motions were initially timely filed and denied but now an intervening change in the law occurring prior to entry of judgment has, quite properly, caused the litigants to renew their motions. Under these circumstances a court still retains its subject matter jurisdiction and indeed has a duty to confront any possible errors causing manifest injustice.

This proposition is supported by the Ninth Circuit's decision in *Arizona v. Manypenny,* 672 F.2d 761 (9th Cir.), *cert. denied,* 459 U.S. 850, 103 S.Ct. 111, 74 L.Ed. 2d 98 (1982). In *Manypenny,* the court held that a district court has the power to reconsider a timely motion for judgment of acquittal if necessary to correct a manifest error. *Id.* at 765–66; *see United States v. Giampa,* 758 F.2d 928, 936 n. 1 (3d Cir. 1985) (court had inherent power to order judgment of acquittal sua sponte beyond scope of time set forth in Rule 29[c]) (citing *Arizona v. Manypenny*); *United States v. Nava–Maldonado,* 566 F.Supp. 1436, 1440 (D.Nev.1983) (same).

The unique set of circumstances here presented are covered neither by Rule 45

---

3. At the hearing the defendants who had gone to trial also moved for reconsideration of their motions for a new trial. As has been the practice throughout the course of the trial these defendants joined each other's motions and the Court accepts the motions before it as the motions of all.

4. Rule 34 provides in relevant part: "The motion in arrest of judgment shall be made within 7 days after verdict or finding of guilty ... or within such further time as the court may fix during the 7–day period." The earliest of the defendants' motions was filed on June 26, 1987. This falls far outside the time allocated by the rule and this Court is without jurisdiction to hear the motion.

nor any specific proscription contained in the Rules of Federal Criminal Procedure. "In all cases not provided for by rule, the district judges ... may regulate their practice in any manner not inconsistent with these rules or those of the district in which they act." Fed.R.Crim.P. 57. "The firing point of the legal system is with the trial judge who is best situated to administer the law and protect the rights of all." *Manypenny*, 672 F.2d at 765 (quoting *U.S. v. Richter*, 488 F.2d 170, 174 [9th Cir.1973]). While mindful that Rule 57 should not be misused and that there are limits to a district court's inherent powers, this Court nonetheless believes it provident to address the motions to reconsider on the merits.

## II. THE MERITS OF THE McNALLY ISSUES

### A. *Motion to Dismiss the Indictment*

"[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974); *United States v. Fusaro*, 708 F.2d 17, 23 (1st Cir. 1983), *cert. denied*, 464 U.S. 1007, 104 S.Ct. 524, 78 L.Ed.2d 708 (1983). When the counts in an indictment track the statutory language with specificity and the language sets forth all the elements necessary to constitute the offense, the *Hamling* test is satisfied. *Fusaro*, 708 F.2d at 23; *United States v. Gordon*, 780 F.2d 1165, 1171 (5th Cir.1986). The indictment here tracks the language of 18 U.S.C. § 371, the conspiracy statute, and the language of 18 U.S.C. § 1962(c), the racketeering statute. All the conspiracy counts, i.e., Counts I, III, V–VII, and the racketeering count, Count XI, also charged the material elements of the mail fraud statute, the substantive crime which was the subject of the conspiracy and racketeering counts. Under the mail fraud statute,[5] 18 U.S.C. § 1341, the material elements are (1) use of the mails, (2) for the purpose of executing, (3) a scheme or artifice to defraud. *Gordon*, 780 F.2d at 1170. Each of the conspiracy counts, as well as the RICO count, charged that the defendants conspired to devise and participate in a scheme and artifice to defraud the Commonwealth and caused the United States mails to be used in executing their scheme. *See, e.g.*, Indictment, Count I, ¶¶ 8, 9, 22(gg); Count III, ¶¶ 4, 7(e)(i); Count XI, ¶ 9. The defendants, however, argue that even if the indictment was heretofor sufficient it fails to withstand scrutiny after the Supreme Court's decision in *McNally v. United States*, — U.S. —, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987).[6]

In *McNally*, the Supreme Court interpreted the mail fraud statute as "limited in scope to the protection of property rights." *Id.*, — U.S. at —, 107 S.Ct. at 2881. For the purposes of that action, an alleged failure to disclose a financial interest to other persons in state government, where there was no charge by the judge or finding by the jury of a deprivation of money or property from the state, was held not to constitute conduct within the reach of § 1341. *Id.* at — & n. 9, 107 S.Ct. at 2882 & n. 9, 2883.[7]

---

**5.** Section 1341 provides in relevant part:

"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, ... for the purpose of executing such scheme or artifice or attempting so to do, [uses the mails or causes them to be used,] shall be fined not more than $1,000 or imprisoned not more than five years, or both."

**6.** The parties assume and this Court accepts that *McNally* is binding law on this case. *See Hamling v. United States*, 418 U.S. 87, 102, 94 S.Ct. 2887, 2899, 41 L.Ed.2d 590 (1974) ("Our prior decisions establish a general rule that a change in the law occurring after a relevant event in a case will be given effect while the case is on direct review."); *see also Griffith v. Kentucky*, — U.S. —, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987) (retroactive application of newly declared constitutional rules to pending criminal cases the norm).

**7.** Although the Supreme Court opinion paid specific attention to the substantive offense of mail fraud, the Supreme Court noted that its decision was equally applicable to a count charging conspiracy to commit mail fraud and for that reason also reversed the petitioners' conviction under 18 U.S.C. § 371. *McNally*, — U.S. at —, 107 S.Ct. at 2882.

In its decision, the Supreme Court did not pass on the sufficiency of the indictment which included language that the "petitioners had devised a scheme ... to obtain, directly and indirectly, money and other things of value," *id.* at ——, 107 S.Ct. at 2878, but instead rested its decision on the district court's erroneous "intangible rights" instruction. In its charge, the district court had instructed the jury, relying on a plethora of decisions from the courts of appeals, *see id.* at ——, 107 S.Ct. at 2883 n. 1 (Stevens, J., dissenting) (collecting cases), that it need not find a deprivation of money or property but only need find a scheme to defraud the citizens of their intangible rights to "honest and impartial government."

▆ In the indictment contested here, the government did include language that amounted to an "intangible rights" theory as was set forth by the Sixth Circuit Court of Appeals in *United States v. Gray*, 790 F.2d 1290 (6th Cir.1986) and rejected by the Supreme Court in *McNally*. This is not fatal, however, when the indictment is read as a whole.

In each conspiracy count, as well as the RICO count, the government charged that an objective of the conspiracy was for the defendant or others to be promoted within the relevant police department and thereby receive the benefits of the promotion, including the increased salary and pension benefits. *See, e.g.,* Indictment, Count I, ¶ 1; Count III, ¶ 6; Count XI, ¶ 5. In the subsidiary conspiracies charged in Counts III, V and VII, and VI against Arthur J. Pino and Frank Ray, Robert W. Clemente, Sr., and John A. Deliere, the indictment specifically charges an increase in the periodic salary payments due to the promotion. In addition, each count charges that advance copies of police promotional examinations were stolen and copies of the particular examination were then sold to others for a sum of money. These examinations were the property of the Commonwealth and possessed intrinsic value; the purchase of the examinations as the first step in the

defendants' scheme to defraud the Commonwealth of honest police service and periodic salary payments.

Thus, the conduct charged in the indictment here falls within the reach of § 1341, even under the new, more limited, interpretation of that statute as set forth by the Supreme Court in *McNally*.

Although the Court's ruling at this stage only begins the analysis as to Thomas K. Doherty, Nelson E. Barner, Nicholas Salerno, Arthur J. Pino, Robert W. Clemente, Sr., and John A. Deliere, it effectively ends consideration of Frank Ray's motion to withdraw his guilty plea. Under the amendment to Fed.R.Crim.P. 32(d), Ray's motion to withdraw his plea after sentence may be set aside by this Court only pursuant to 28 U.S.C. § 2255. As grounds for setting aside the sentence, Ray advances a single argument—that what he pled guilty to, as charged in the indictment, is no longer a crime. An intervening change in the law is certainly an adequate ground for relief under § 2255. *Robson v. United States*, 526 F.2d 1145, 1147–48 (1st Cir. 1975) (citing *Davis v. United States*, 417 U.S. 333, 342, 94 S.Ct. 2298, 2303, 41 L.Ed. 2d 109 [1974]). Here, however, the indictment is consonant with the change effected by the Supreme Court's decision in *McNally*. On the basis of the foregoing, Mr. Ray's motion to withdraw his guilty plea is denied.[8]

**B.** *Renewed Motions for Judgment of Acquittal*

"There is only one ground for a motion for a judgment of acquittal. This is that 'the evidence is insufficient to sustain a conviction' of one or more of the offenses charged in the indictment or information." 2 C. Wright, *Federal Practice and Procedure* § 467, at 654 (1982) (continuing on to note that courts have also held variance in the proof and improper proof of venue within Rule 29 motion). The same standard applies to both trial and appellate courts, *id.* at 655–56, i.e., was there "sufficient evidence on which reasonable persons

---

8. As a result of the Court's ruling as to Count III, Ray's attack on the perjury count, Count IV,

is equally without merit and relief is therefore similarly denied.

could find guilt beyond a reasonable doubt." *United States v. Leach,* 427 F.2d 1107, 1111 (1st Cir.), *cert. denied,* 400 U.S. 829, 91 S.Ct. 95, 27 L.Ed.2d 59 (1970).

In reviewing a Rule 29 motion the court must consider the evidence as a whole taken in the light most favorable to the Government, together with all legitimate inferences to be drawn therefrom to determine whether a rational trier of fact could have found guilt beyond a reasonable doubt. *United States v. Patterson,* 644 F.2d 890, 893 (1st Cir. 1981). The Government may prove its case entirely by circumstantial evidence and need not exclude every reasonable hypothesis of innocence, provided the record as a whole supports a conclusion of guilt beyond a reasonable doubt. *United States v. Gabriner,* 571 F.2d 48, 50 (1st Cir.1978).

*United States v. Smith,* 680 F.2d 255, 259 (1st Cir.1982), *cert. denied,* 459 U.S. 1110, 103 S.Ct. 738, 74 L.Ed.2d 960 (1983). Here, the record of the instant trial, considered as a whole, amply supports the jury's verdict. Given the Court's previous ruling on the sufficiency of the indictment, a judgment of acquittal is not warranted. There was ample direct testimony, especially from the government's chief witness and fellow co-conspirator, Gerald W. Clemente, Jr., to convince the jury of the defendants' guilt beyond a reasonable doubt. Stated in another way, the government here presented sufficient evidence that—if believed— could cause a reasonable minded jury to find beyond a reasonable doubt that the convicted defendants, both in the general and specific conspiracies and in the racketeering count, intended to defraud the Commonwealth of money and property, and did in fact do so. *See generally Curley v. United States,* 130 F. 1 (1st Cir.), *cert. denied,* 195 U.S. 628, 25 S.Ct. 787, 49 L.Ed. 351 (1904), *cited with approval on other grounds* in *McNally v. United States,* —— U.S. ——, —— n. 8, 107 S.Ct. 2875, 2881 n. 8, 97 L.Ed.2d 292 (1987) (discussed *infra*). Accordingly, the renewed motions for judgment of acquittal are denied.

### C. *Renewed Motions for a New Trial*

A court's power in ruling upon a motion for a new trial is significantly broader than when it considers a motion for judgment of acquittal. A motion for a new trial may be granted if required in the "interest of justice." Fed.R.Crim.P. 33. Here, the defendants argue that an error in this Court's jury instructions substantially affected the rights of each accused and therefore a new trial is warranted.

This Court's instructions to the jury defined a scheme or artifice to defraud as:

some plan or course of conduct to perpetrate a fraud upon another. The scheme need not be fraudulent upon its face. It need not involve the affirmative misrepresentation of any fact. What is necessary is that the scheme be reasonably calculated to deceive other people. The object of the scheme need not be money or any form of tangible property. A scheme to defraud the citizens of Massachusetts or other law enforcement officers can come within the meaning of the statute which speaks of a scheme or artifice to defraud.

Jury Instructions, April 29, 1987, at 38. At the time given, the instructions were not only the law of this Circuit, *United States v. Silvano,* 812 F.2d 754, 759 (1st Cir.1987), but also the law of every circuit that had addressed the issue of "intangible rights" and the mail fraud statute. *McNally,* —— U.S. at —— n. 1, 107 S.Ct. at 2883 n. 1 (Stevens, J., dissenting) (collecting cases). In light of *McNally,* however, the portion of the instructions that states, "The object of the scheme need not be money or any form of tangible property," is now certainly error. The issue then becomes the role of that error in the conduct of the trial.

█ In exercising its discretion in passing on a new trial motion, *United States v. Wright,* 625 F.2d 1017, 1019 (1st Cir.1980), a court should keep in mind the harmless error provisions of Fed.R.Crim.P. 52, and refuse to grant a new trial if substantial rights of the defendant were not prejudiced. *United States v. Hayes,* 479 F.Supp. 901, 918–19 (D.P.R.1979), *aff'd in part,* 653 F.2d 8 (1st Cir.1981); 3 C.

Wright, *Federal Practice and Procedure* § 551, at 237–38 (1982).

■ The standard for determining when an error in a jury instruction requires a new trial is the general standard for determining harmless error. *See United States v. Argentine,* 814 F.2d 783, 789 (1st Cir.

1987); *United States v. Lemire,* 720 F.2d 1327, 1339 n. 16 (D.C.Cir.1983), *cert. denied,* 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 874 (1984) (citing *Hamling v. United States,* 418 U.S. 87, 108, 94 S.Ct. 2887, 2902, 41 L.Ed.2d 590 [1974]).[9] Under that standard,

9. The decision to apply Fed.R.Crim.P. 52(a) (harmless error) and not Fed.R.Crim.P. 52(b) (plain error) is a close one. At the time the instruction was given to the jury, none of the defendants objected to it as is required under Fed.R.Crim.P. 30. In fact, the government, much to its credit, had requested an instruction requiring the jury to find that the schemes to defraud were intended to obtain money or property. At the conclusion of the charge the government requested that its supplemental modified instruction which added the words "money or property," be given to the jury. The Court believed, and so stated at that time, that the instruction covered the proposed modification. Jury Instructions, April 28, 1987 at 48.

Not only did the defendants not object, but the government argues that three of them actually "invited" the error. *United States v. Kakley,* 741 F.2d 1, 3 (1st Cir.1984) ("invited" error in jury instruction may not be raised on appeal), *cert. denied,* 469 U.S. 887, 105 S.Ct. 261, 83 L.Ed.2d 197 (1984). Defendant Salerno requested an "intangible rights" instruction premised on the Sixth Circuit Court of Appeals decision in *United States v. Gray,* 790 F.2d 1290 (6th Cir. 1986), reversed by the Supreme Court in *McNally.* Jury Instructions, April 28, 1987, at 53. This request was joined by defendants Barner and Robert W. Clemente, Sr. The requested instruction was based on the "fiduciary duty" theory of "intangible rights" deprivation set forth in *Gray.* Given the state of the law at the time of the charge conference and the actual charge, however, this Court cannot in good conscience agree with the government that the defendants invited error. This does not resolve the problem, of course, but rather only presents more starkly the Court's dilemma in deciding whether Rule 52(a) or 52(b) is applicable.

The government presses that since none of the defendants objected to the instructions they now must demonstrate "plain error" which "affected substantial rights." *United States v. Fusaro,* 708 F.2d 17, 22 (1st Cir.1983). At first blush, the government's standard has appeal since Rule 52(b) must be read in conjunction with Rules 30 and 52(a) and seemingly provides the only avenue for a defendant who failed to raise an objection before the jury retired. The problem arises in the government's assumption that Rule 52(b) is applicable to trial courts. The Court does not dispute that by its terms, although "more frequently applied in an appellate context, Rule 52 governs disposition of post-trial motions at the district court level." *United States v. Goldstein,* 386 F.Supp. 833, 842 n. 19 (D.Del.1973), *rev'd on other grounds,* 502 F.2d

526 (3d Cir.1974) (citing 3 C. Wright, *supra* p. 13, at § 851); *see* Fed.R.Crim.P. 54 ("These rules apply to all criminal proceedings in the United States District Courts...."). Rule 52(b), however, has been interpreted in such a way as to become quite a different animal. It is directed at those occasions where errors "may be noticed although *they were not brought to the attention of the court.*" Fed.R.Crim.P. 52(b) (emphasis added). "[A] decision as to whether plain error has occurred *inevitably means that the government had no opportunity to respond below...."* *United States v. Blackwell,* 694 F.2d 1325, 1340 n. 22 (D.C.Cir.1982) (emphasis added). Here, the error has been brought to the attention of the court, and the government has responded.

In *United States v. Frady,* 456 U.S. 152, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982), the Supreme Court added significant gloss to the Rule in opposition to the position here argued by the government. In acting on a § 2255 motion and deciding whether Rule 52(b) applied to collateral attacks on a conviction, the Supreme Court stated that "[b]y its terms, recourse may be had to [Rule 52(b)] only on *appeal* from a trial infected with error so 'plain' the trial judge and prosecutor were derelict in countenancing it, even absent the defendant's timely assistance in detecting it." *Id.* at 163, 102 S.Ct. at 1592. The Supreme Court went on to note the Rule merely restated existing law. *Id.* at 163 n. 13, 102 S.Ct. at 1592 n. 13 (citing *United States v. Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936) ("In exceptional circumstances, especially in criminal cases, *appellate courts,* in the public interest, may, of their own motion, notice errors to which no exception has been taken....") (emphasis added)). In the next footnote, the Supreme Court noted "[t]he Courts of Appeals long have recognized that the power granted them by Rule 52(b) is to be used sparingly." 456 U.S. at 163 n. 14, 102 S.Ct. at 1592 n. 14. The Supreme Court concluded that the "plain error" standard is inapplicable to a § 2255 motion "[b]ecause it was intended for use on direct appeal." *Id.* at 164, 102 S.Ct. at 1592. Although as a matter of first impression this Court considers the government and the dissent to *Frady, id.* at 179, 102 S.Ct. at 1600 (Brennan, J., dissenting) (noting lack of "trial" or "appeal" heading to Rule 52[b] and arguing that it is applicable to "all stages of all criminal proceedings in federal courts") have the better argument, the majority in *Frady* appear to hold otherwise. For that reason the Court proceeds pursuant to Rule 52(a).

If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or a specific command of Congress.... But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

*Kotteakos v. United States*, 328 U.S. 750, 764–65, 66 S.Ct. 1239, 1247–48, 90 L.Ed. 1557 (1946) (footnote omitted). The Supreme Court, in *Hamling*, in applying this standard generally in a case where it noted the petitioners sought to claim the benefit of a change in the law, held that reversal is required "where there is a probability that [the errors in the instructions] would have materially affected the deliberations of the jury." 418 U.S. at 108, 94 S.Ct. at 2903. In relying on *Hamling*, the District of Columbia Circuit Court of Appeals noted that while errors in jury instructions misstating the elements of a crime have "great potential for unfairness," it did not find that they there reached constitutional magnitude. *Lemire*, 720 F.2d at 1339 n. 16. Although constitutional error was not found in either *Hamling* or *Lemire*, this Court nonetheless approaches the error here under the more exacting standard of whether the error was "harmless beyond a reasonable doubt" because the defendants' rights to a fair trial and due process may very well have been violated. *See Chapman v. California*, 386 U.S. 18, 24, 87

S.Ct. 824, 828, 17 L.Ed.2d 705 (1967) (errors of constitutional dimension require reversal unless "harmless beyond a reasonable doubt").

In applying this exacting standard, one must frankly recognize that, to find the error made here "harmless," one must conclude beyond a reasonable doubt that had the jury—contrary to the instructions given here—been told that an object of the conspiracies here charged must, in the case of each separate defendant, have been the defrauding of the Commonwealth of money or tangible property, it would nevertheless have convicted each of these defendants. Nothing less will do.

In addressing this issue, this Court has been guided—and persuaded—by the common sense mode of analysis expressed by Judge Patricia Wald speaking for the District of Columbia Circuit Court in *Lemire*. In *Lemire*, the court of appeals was confronted on appeal with an issue not unlike the one present here. An employee was charged with failing to disclose a conflict of interest to his employer in a scheme to defraud the employer under the wire fraud statute, 18 U.S.C. § 1343.[10] Similarly to the Supreme Court in *McNally*, the court of appeals held that for such conduct to be in violation of the wire fraud statute the jury must find that the defendant's nondisclosure furthered a "scheme to abuse the trust of an employer in a manner that makes an identifiable harm to him...." *Id.* at 1337. In other words, some concrete business harm must have been contemplated by the defendant. *Id.* The court then turned to the trial judge's instructions.

In reviewing the charge the court reasoned that

If in light of all the circumstances—the language of the instructions, the arguments of counsel, and the evidence itself —we find that ... these factors cumulatively indicate that it is highly improba-

---

In any event, the Court notes that even under the plain error standard, errors of constitutional dimension, as may have existed here, will be noticed more freely. *United States v. Shue*, 766 F.2d 1122, 1132 (7th Cir.1985).

10. The court noted that "cases construing mail fraud apply to the wire fraud staute as well." 720 F.2d at 1335 n. 6.

ble that the jury found the defendants guilty under an improper legal theory, technical errors in the instructions are deemed harmless, and we will affirm. *Id.* at 1339.

Although the court found that the judge's instructions were "technically correct," its method at arriving at that conclusion can only be fairly characterized as extending plenary deference to the trial court and a willingness to refashion the tenor of the charge. It is the alternative ground for its affirmance of the convictions that is of significance here. In *Lemire,* the District of Columbia Circuit stated that "[i]n the context of this trial, and in light of the actual evidence and arguments presented to the jury we think it extremely unlikely that the jury was misled into thinking that the mere failure to disclose ... was sufficient to constitute wire fraud." *Id.* at 1341. After reviewing the context of the trial including the evidence and arguments presented, the court concluded that the jurors did not convict on an improper theory.[11]

■ Here, of course, the jury was expressly told that an object of the conspiracy need *not* be the defrauding of the Commonwealth of money or property. Still, *Lemire* is persuasive authority here, as this case—with respect to all the convicted defendants save Nelson Barner—turned not at all on what the defendants' were up to but on whether the government's evidence was credible beyond a reasonable doubt. The jury clearly chose to believe it. Thus, the jury must have found that the chief government witness, Gerald W. Clemente, Jr., stole promotional examinations on numerous occasions in advance of their general administration and then offered them for sale to certain of the defendants

for $3,000 each, or some comparable value in services; that the defendant Thomas K. Doherty, indicted and convicted on Counts I and XI, aided in the thefts and shared equally in the proceeds of the sales; that the defendant Salerno, also convicted on Count I, bought and resold a number of examinations; and that the defendants Pino, Robert W. Clemente, Sr., and Deliere were all "retail customers" or consumers of the stolen examinations. Indeed, each of the last three named defendants stipulated to the receipt of salary payments from the time of their promotion after examination until the time of the indictment.[12] The entire thrust of the government's case was not only that the defendants' deprived the Commonwealth of honest police services, but also that these defendants acted to bring about financial gain to themselves—financial gain with a concomitant financial loss to the Commonwealth in the form of stolen property and disbursements of funds procured fraudulently.

It borders on the absurd, therefore, to infer as to these defendants that the jury—necessarily accepting the government's evidence in order to find each of the elements charged beyond a reasonable doubt—nevertheless disbelieved the equally probative evidence that an essential concomitant of these schemes was that the Commonwealth would be defrauded of money or property in accordance with the dictates of *McNally.* The Court believes beyond a reasonable doubt as to these defendants that the jury verdict encompassed this element even absent the specific instruction requiring them to so find. Therefore, the admitted failure of this Court to incorporate the language on "money or property deprived" did not result in a conviction on an improper theo-

11. The court also noted it would be hesitant to reverse since the defendants failed to apprise the trial judge of any dissatisfaction with the language of the proposed instruction either at the pre-charge conference or when the charge was given. 720 F.2d at 1343 & nn. 24–25.

12. "When a jury is properly instructed with respect to the only disputed issues in the case, the erroneous instruction with respect to an undisputed issue is harmless error." *McGuinn v. Crist,* 657 F.2d 1107, 1108–09 (9th Cir.1981) (dis-

approved jury instruction on intent of accused where intent was not an issue was harmless error beyond a reasonable doubt), *cert. denied,* 455 U.S. 990, 102 S.Ct. 1614, 71 L.Ed.2d 850 (1982). This principle, while not directly apposite here, lends emphasis to the point that the credibility of the government's evidence—not the intent of the defendants other than Barner, was the dominating, indeed the crucial, issue at this trial.

ry, and for that reason it constitutes harmless error beyond a reasonable doubt as to the defendants Thomas K. Doherty, Salerno, Pino, Robert W. Clemente, Sr., and Deliere. *See Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). Their motions for a new trial must accordingly be denied.

■ The case against Nelson E. Barner stands on a different footing. While the jury certainly found that Barner intentionally conspired to deprive the Commonwealth of certain intangible rights in the honest and upright service of its police officers, especially its superior officers, thus abusing his position and dishonoring himself, this Court is unable to rule beyond a reasonable doubt that the jury concluded that Barner intended to defraud the Commonwealth of money or property even though this was an essential object of the conspiracy of which the jury found him to be a conspirator.

The reason for the divergence in rulings lies in the slightly differing nature of the proof as to Barner. To understand its significance it is essential to rehearse the scheme with which Barner was charged. Reduced to its essentials, Count I charged Gerald W. Clemente, Jr. and Thomas K. Doherty with entering the offices of the Massachusetts Department of Personnel Administration to obtain advance copies of police entrance and promotional examinations which could then be sold for profit to those seeking appointment or promotion in police departments in the Commonwealth. As part of this scheme it was intended that the purchasers be promoted and thereby attain the power, prestige, and economic

benefits of that promotion. *See generally Curley v. United States,* 130 F. at 12–13. Barner's role was to "research the correct answers to the questions appearing on the stolen police entrance or promotional examinations." Indictment, Count I, ¶ 18. Although this Court does not doubt that Barner was a consumer like three of his codefendants,[13] this is not the gravamen of the charge against him.[14] The conspiracy charge in Count I is obviously much broader and, on the government's evidence, it extended over a considerable period of time. Unlike Gerald W. Clemente, Jr., Thomas K. Doherty, or Nicholas Salerno, there is no evidence that Barner himself gained financially from the general implementation of the Count I conspiracy. Although under *McNally* it does not appear necessary that the defendant himself gain, only that—in the circumstances of this case—he intend that the Commonwealth be fraudulently deprived of money or property, direct financial gain by a defendant is important circumstantial evidence of the defendant's intent to defraud the Commonwealth and obtain its money or property wrongfully. Conspiracy is a specific intent crime and "intent is an issue of crucial import." *United States v. Scelzo,* 810 F.2d 2, 4 (1st Cir.1987). Here, where evidence of Barner's direct financial gain from the broad conspiracy alleged and proved is notably lacking, the issue whether the jury meant to find that Barner specifically intended to defraud the Commonwealth of money or property "is excruciatingly close —so close that justice requires that [this Court] resolve it in favor of the accused." *United States v. Argentine,* 814 F.2d 783, 789 (1st Cir.1987).[15]

---

**13.** According to the government's evidence, Barner received an advance copy of the September 1979 captain's examination for the Metropolitan District Commission Police Department. He was subsequently promoted to the rank of captain.

**14.** If it were, this Court would have no hesitancy in denying his motion for a new trial.

**15.** This Court is well aware that Barner has been convicted of precisely the same conspiracy as Salerno and Thomas K. Doherty and has reasoned that such conspiracy necessarily involved defrauding the Commonwealth of money

or property. Thus, to grant Barner a new trial simply because he did not himself profit from the general implementation of this conspiracy is subtle at best and necessarily weakens the reasoning which leads the Court to the conclusion that the error in the charge was harmless as to the others. Still, as Mr. Justice Holmes put it, "The life of the law has not been logic: it has been experience." O. Holmes, Jr., *The Common Law,* 1 (Little, Brown & Co., 1881). Upon the totality of the record in this case—the pleadings, the evidence, and the arguments of counsel— this Court is satisfied to a moral certainty that the error in the charge had no effect whatsoever

Accordingly, Nelson E. Barner's motion for a new trial as to Count I must be granted.[16]

## III. OTHER SIGNIFICANT ISSUES

### A. *Plea Agreements*

■ At the outset of this trial, the defendants objected to the introduction in evidence of the plea agreements entered into between the government and its chief witnesses, notably Gerald W. Clemente, Jr. and Joseph P. Bangs. Although the issue was not pressed by the defendants post-trial, the Court takes this opportunity to articulate the bases of its ruling in light of recent developments in the law in this area.

In *United States v. Martin*, 815 F.2d 818 (1st Cir.1987), the defendant argued that it was error for the district court to allow the government to read to the jury the full contents of the plea agreements. The defendant argued that the inclusion of a provision which stated that the witness would be exposed to prosecution for perjury if he testified falsely amounted to improper vouching by the government for the witness' credibility. *Id.* at 821. The First Circuit rejected the argument holding that it did "not agree that informing the jury of the contents of a plea agreement of, at least, normal stripe is error." *Id.* The court went on to add that

> [T]he admission into evidence of plea agreements "does not constitute impermissible bolstering of the witness's credibility." ... Such agreements may often, as in the present case, point in different directions: a warning therein that the defendant will be prosecuted for false testimony enhances his credibility as a witness, but the rewards promised to him in the same document may undermine his

credibility by showing that he stood to gain from incriminating others.

*Id.* (citations omitted). The crucial concern for the court was that the prosecutor not portray him or herself as a "guarantor of truthfulness" of the witness by placing the prestige of the government behind the witness. This may occur either by explicit assurances of the witness' veracity or by "implicitly vouch[ing] for the witness' veracity by indicating that information not presented to the jury supports the testimony." *Id.* at 822 (quoting *United States v. Sims*, 719 F.2d 375, 377 [11th Cir.1983], *cert. denied*, 465 U.S. 1034, 104 S.Ct. 1304, 79 L.Ed.2d 703 [1984] [citations omitted]). The court concluded that the government's closing argument highlighting the possibility of a prison term for the witness if he failed to tell the truth was not error, especially where the defense cross-examined the witness on the agreement to attack his credibility. *Id.* at 822–23.

More recently, in *United States v. Munson*, 819 F.2d 337 (1st Cir. 1987), the court held that the government did not act improperly when on redirect, after vigorous cross-examination attacking their witnesses' credibility, it elicited from the witnesses that part of their agreement was to testify truthfully. *Id.* at 345. Although it expressed some reservations about the practice, the court also upheld as error free the government's initiation on direct examination of subsequent witnesses of the same promises to testify truthfully. *Id.* at 345–346.

In the instant case, counsel for the defendant Deliere moved to preclude the admission of the plea agreement the government made with Gerald W. Clemente, exhibit AE for identification.[17] If admitted,

on the verdicts returned against Thomas K. Doherty, Salerno, Pino, Robert W. Clemente, Sr., and Deliere. Their convictions must, therefore, stand. The Court cannot say the same for Nelson E. Barner. He must, therefore, have a new trial upon the conspiracy charge.

16. Contrary to Barner's assertions, his perjured testimony before the Grand Jury was material to an investigation of a federal offense, *see supra* § II. A., and therefore his motion for a new trial as to Count II on perjury must be denied. *See United States v. Sisack*, 527 F.2d 917, 920

(9th Cir.1975) ("The mere possibility that violations of federal law have occurred is sufficient authority for a grand jury investigation.").

17. Although the Court addresses specifically the government's agreement with Gerald W. Clemente, Jr., counsel for Deliere renewed his motion as to the subsequent government witnesses who entered into plea agreements. The discussion herein is equally applicable to those agreements, which were in substance the same.

counsel sought to have the agreement sanitized. Specifically, he sought to have references to a government witness protection program and the requirement of truthful testimony deleted. Other counsel joined in the motion and counsel for Thomas K. Doherty also sought to have a reference to the willingness of the witness to submit to a polygraph examination redacted.[18] The Court ordered that the paragraph concerning polygraphs [19] be redacted, ¶ A.3, as well as references to a "non-threatening environment," ¶ B.6, and the word "protection" in federal witness protection program, ¶ B.7. The Court then permitted the government to ask the witness his understanding of the agreement and allowed the government to read the redacted version to the jury. The agreement was also admitted in evidence. Tr. Feb. 3, 1987, at 11–21. Defense counsel subsequently explored the agreement with the witness. Vigorous cross-examination attacking the witness' credibility extended over many days.

The Court concludes that the government in no way acted as the "guarantor of truthfulness" of any of its witnesses, either explicitly or implicitly. The procedures used comport fully with the teachings of the First Circuit as expressed in *Martin* and *Munson.*

### B. *Severence*

■ Prior to the commencement of the trial of this action, various of the defendants moved for relief from allegedly prejudicial joinder pursuant to Fed.R.Crim.P. 14. These motions were denied. To protect the rights of the defendants, however, and to assist the jury in following the evidence, this Court ordered that the trial proceed in a somewhat segmented fashion. That is, the government was required to put on all its evidence of the "general" or "hub" conspiracy first. When this evidence was in, the government was required to present all its evidence on each of the "retail" or "spoke" conspiracies separately, one after another. This meant that certain witnesses, especially the key government witnesses, would be required to take the stand more than once—first testifying as to the general conspiracy and thereafter reappearing to give their testimony concerning a particular conspiracy to retail a particular police promotional examination. Defense counsel were permitted to cross-examine all witnesses who were to give evidence against their clients as soon as the first direct examination of that witness had completed so that they might challenge the credibility of that witness at the earliest possible moment, even though the witness might, at the time the opportunity for cross-examination was first afforded, be testifying only as to matters germaine to the general conspiracy. Further, defense counsel were permitted to cross-examine the same witness anew during the presentation of evidence on each of the retail or spoke conspiracies wherein such evidence was received against their clients.

These procedures made the trial somewhat longer than it otherwise would have been (in fact, it ran twice as long as counsel's most liberal estimate), but in the judgment of the Court, the evidence was presented in the most intelligible possible pattern and maximized the jurors' understanding of the differences in the proof against each individual defendant as well as the necessary limitations upon the evidence received. The discerning questions posed by the jury during the deliberation process and its decision to acquit two of the defendants of one of the alleged retail conspiracies is strong evidence that the jury well understood the process followed by

---

**18.** Counsel for Deliere objected to this redaction.

**19.** This Court's ruling was premised on the insufficient reliability of polygraph information under *Frye v. United States,* 293 F. 1013 (D.C.Cir. 1923). *Commonwealth v. Vitello,* 376 Mass. 426, 381 N.E.2d 582 (1978). *See generally* Mattleman, *Evidence: Scientific Techniques and Testimony,* 1985 Ann.Surv.Am.L. 817. The Court did eventually allow cross-examination on Gerald W. Clemente, Jr.'s willingness to subject himself to a polygraph examination after the witness, in an unresponsive, unsolicited broadcast response to defense counsel's questioning, volunteered his present desire to take a polygraph examination. The results of any prior polygraph examinations were not admitted or explored by counsel per order of the Court.

the Court and the evidentiary limitations imposed on its deliberations.

Nevertheless, defense counsel interposed numerous oral motions for severance during the course of the trial and, after these were all denied and the jury's verdict was returned, defense counsel have argued post-trial that a new trial must be ordered-since they, or certain of them, suffered prejudice from their joinder with the other defendants. The Court has denied the application for post-trial relief on this ground. The defendants Pino, Robert W. Clemente, Sr., and Deliere make the most telling argument in this regard. Each of these defendants argues that, given the manner in which the Court segmented the trial, the repeat appearances of certain of the government's key witnesses, and the length of the trial itself, they were each irreparably prejudiced since the veracity of the key witnesses against them had been so firmly fixed in the juror's minds prior to the receipt of the specific testimony concerning the particular retail conspiracy in which they each were alleged to have been involved, that they stood no chance to shake the witnesses against them on cross-examination.

Upon examination, however, there is nothing to this argument. There is absolutely no indication that the jury did aught but carefully follow the instructions and evidentiary limitations imposed by the Court and, as stated above, the particular procedure followed at trial tended to maximize the individuality of the case against each of these defendants rather than lump them in with other alleged wrongdoers. Moreover, the fact that a particular co-conspirator may have played only a bit part in a related series of conspiracies has never been thought grounds to warrant a severance. *United States v. Arruda,* 715 F.2d 671, 679 (1st Cir.1983); *United States v. Smolar,* 557 F.2d 13, 21 (1st Cir.), *cert. denied,* 434 U.S. 866, 98 S.Ct. 203, 54 L.Ed. 2d 143 (1977). For these reasons, all the motions related to severance were denied by this Court.[20]

## C. *Excusing a Deliberating Juror*

In the early hours of May 3, 1987, after fifty-four days of trial and three days of jury deliberation, the Court, faced with an emergency situation involving a deliberating juror, excused that juror without consulting counsel and without making a wholly adequate record. The defendants claim

**20.** While Fed.R.Crim.P. 14 appears to limit the focus of the Court's attention to concerns that either the government or a defendant may be prejudiced by such joinder, the experience of presiding over this fifty-four-day trial convinces this Court that the interests of the jury are perhaps equally significant. That is, it appears increasingly evident to this Court that the government favors ever more lengthy trials of larger and larger groups of defendants. While individual defendants may not be able to point to identifiable prejudice from such tactics, any trial lawyer knows that the government gains a tactical advantage from such a grouping. To the extent that we are concerned about the highest quality of justice in our courts, however, the rules under which we operate ought reflect a concern for the jury system—that vital expression of direct democracy which charges the entire judicial structure with its moral force. It is simply unreasonable to expect jurors to sit for months and months with little regard to the disruption caused to their families and livelihood. *See* 28 U.S.C. § 1871(b)(1) (establishing juror compensation at thirty dollars per day). Whatever the strictures of the rules of criminal procedure, at some stage due process concerns require that severance be granted in order that

the jury may fairly and properly comprehend the charges against individual defendants. It is far preferable to break a triable action down into manageable, understandable components than to run the risk that the jury may not be able to follow the evidence. For an excellent discussion of this issue on the civil side, see the American Law Institute Report, "Preliminary Study of Complex Litigation" 9 n. 32, 80–85 (March 31, 1987). This Court suspects that, were severance granted on due process grounds more frequently, the actual amount of judicial time spent on a related series of trials would not significantly increase over a single enormous trial of all the defendants together. It has been the experience of this Court that in shorter, related but individual trials, the government sharpens its focus and moves more expeditiously, and the defense does likewise.

While the instant case is short by the standards of trial length we have come to accept as reasonable today, and thus well within due process norms, this Court voices its concerns for the jurors caught up in these enormous trial productions and suggests that justice might better be served by shorter, more individualized, trials.

that this warrants a mistrial and they press motions for a new trial on this ground. Had the juror been excused by the Court during the course of the trial and replaced with an alternate, these arguments would border on the frivolous. *United States v. Corsino*, 812 F.2d 26, 33 (1st Cir.1987). Excusing a deliberating juror, however, is a far more weighty matter. Absent adequate safeguards, a judge could theoretically excuse the lone hold-out in order to force a verdict or could, by use of the excusal power, subtly influence the deliberating jury as to his desires with respect to the verdict. While this Court is satisfied that nothing of the sort occurred in this case, the matter warrants careful review.

It is appropriate first to consider the inadequacies in the record. During their deliberations the jury was sequestered at a local hotel—the hotel to which they returned after concluding their deliberations on May 2, 1987. At about 12:10 a.m. the Chief Deputy United States Marshal called me at home and apprised me of an emergency involving one of the deliberating jurors. I called the hotel and spoke with the Deputy Marshal in charge and, keeping the Deputy Marshal on the line as a witness, spoke with the deliberating juror by telephone. At the end of the conversation, I excused the deliberating juror. A full report of the discussion between judge and juror was made by the Court to counsel first thing the following morning and is set out in the trial transcript at pages 58–1 through 58–7, which portion of the transcript has been impounded to preserve the personal privacy of the juror involved. In addition, there were marked for identification as Exhibits ZC and ZB an incident report prepared in the ordinary course of the business of the United States Marshal's Service and a handwritten report prepared at the Court's direction by Deputy Marshal Jennings who monitored the conversation between judge and juror. Unfortunately, the latter does nothing but reiterate that the judge instructed the juror not to dis-

cuss the case during the course of their conversation. It does nothing to shed light on the circumstances which warranted the juror's removal. While these circumstances are all fully limned in the impounded portion of the transcript, the Court understands the defendants to raise two objections to the procedure followed here.

First, the defendants suggest that as the presiding judge is not competent to testify as a witness at a trial over which he presides, Fed.R.Evid. 605, the report made by the judge on the following morning is of no consequence and the record is thus inadequate to support the excusal of the juror. Second, the defendants suggest that they have been prejudiced since they were afforded no opportunity to argue the matter of the excusal of the juror or to suggest possible alternatives.

The defendants' first argument is without merit. The Court, in making a report of its proceedings with respect to excusing the juror was not "testify[ing] in [this] trial as a witness," the conduct that is forbidden by Fed.R.Evid. 605. Rather, the Court was acting to make a prompt and complete record of its doings and, in effect, was taking judicial notice of proceedings before it pursuant to Fed.R.Evid. 201. Significantly, counsel have not raised the slightest question concerning the accuracy of the report nor have they moved pursuant to Fed.R.Crim.P. 15(a) to take the deposition of Deputy Marshal Jennings, any of the other marshals responsible for the sequestered jury, or perhaps the testimony of the juror himself concerning the circumstances of the moment.[21] In these circumstances, the Court is satisfied that the record is adequate to support the actions taken and to permit meaningful review thereof.

The defendants' attack on the procedure here followed, however, is more on the mark. Our adversary system of justice is our most basic guarantee of individual

---

**21.** The juror himself, of course, would not be competent to testify as to any matter or statement occurring during the course of the jury's deliberations, Fed.R.Evid. 606(b), but he could testify as to the communications which so upset him, his statements to the marshals, and to the Court.

liberty and, in retrospect, I must confess error in proceeding without notifying all counsel. Despite the disruption it would have caused the numerous counsel, the Court staff, and perhaps the other jurors, it would have been far preferable to have communicated with counsel before excusing the juror and, indeed, before talking with him directly. At the time, his emotional state and the risk that he might feel impelled to act contrary to the Marshal's appropriate directions relative to his continued sequestration seemed to mandate prompt action, especially in view of the effect I feared a physical altercation between a juror and the Marshals might have upon the remaining deliberating jurors. In retrospect, however, I am satisfied that such unilateral judicial action was unwarranted and some better alternative could have been worked out through the use of conference calls, arranging a home visit for the juror escorted by the Marshals, or the like. Unfortunately, at 12:35 a.m. these alternatives did not occur to me. This was error.

If it was error, however, it is in the Court's judgment harmless beyond a reasonable doubt since the Court's assessment of the state of mind of the juror involved and his compelling need to be reunited with his family unfortunately rendered him unable to continue the cool and reflective deliberative process that must be the hallmark of our jury system. In short, the Court is satisfied that, even had a full hearing as to the juror's unfortunate inability to continue been held, the result would most assuredly have been the same. The defendants, even though possessed of all the information known to the Court, have

failed to suggest any reasonable alternative other than excusing the juror. Moreover, a comparison of this situation with that present in *United States v. Charris*, 822 F.2d 1213, 1222–1223 (1st Cir.1987), demonstrates that the need to excuse the juror here was far more compelling.

Upon this reasoning, the Court has denied the defendants' motions for a mistrial arising out of this incident and has likewise denied their motions for a new trial.[22]

### D. *Statute of Limitations*

The defendants Pino, Robert W. Clemente, Sr.,[23] and Deliere attack their convictions for conspiring to commit mail fraud on the ground that the government failed to prove some overt act in furtherance of the conspiracy within the applicable statutory period. The applicable statute of limitations for the crime of conspiracy, 18 U.S.C. § 371, of which the defendants were charged and convicted, is found at 18 U.S.C. § 3282. Pursuant to § 3282, the indictment must be brought within five years after the commission of the offense. In a conspiracy case, the statute runs from the date of the last overt act. *Fiswick v. United States*, 329 U.S. 211, 216, 67 S.Ct. 224, 227, 91 L.Ed. 196 (1946). Whether a defendant's conduct may properly be regarded as an overt act in furtherance of the conspiracy depends upon the scope of the conspiratorial agreement. *Grunewald v. United States*, 353 U.S. 391, 397, 77 S.Ct. 963, 970, 1 L.Ed.2d 931 (1957). Understandably, the defense and prosecution have different interpretations of the scope or object of the conspiratorial agreement.

The defendants [24] contend that their re-

---

**22.** Once the Court had excused the juror, the government sought to continue the deliberations with eleven jurors pursuant to Fed.R. Crim.P. 23(b). At the urging of the defendants, however, the Court replaced the excused juror with an alternate who had also been sequestered, and directed the deliberations to begin anew. Thereafter the jury deliberated for five days before returning their verdict. The defendants do not object to this procedure which they instigated. *But see Post–Submission Substitution of Alternate Jurors in Federal Criminal Cases: Effects of Violations of Federal Rules of*

*Criminal Procedure 23(b) and 24(c)*, 55 Fordham L.Rev. 861 (1987).

**23.** Robert W. Clemente, Sr. attacks the government's alleged failure to bring the indictment within the five-year statutory period only as to Count V. He does not challenge his conviction on Count VII on this theory. Arthur J. Pino and John A. Deliere were each indicted and convicted on one count.

**24.** Defense counsel advance essentially the same arguments with all counsel adopting the arguments of counsel for Deliere.

spective agreements [25] were to defraud the Commonwealth of Massachusetts by having each defendant obtain advance copies of promotional examinations for a certain sum of money or service paid to Gerald W. Clemente, Jr. in order to increase their chances of being promoted within the ranks of their respective police departments. They argue that the statute started running when the examinations were administered, i.e., that the act of sitting for the examination constituted their last overt act. In the case against Robert W. Clemente, Sr. this occurred on April 21, 1979; in the case against Arthur J. Pino, March 3, 1979; and in the case against John A. Deliere, September 8, 1979.[26] They go on to contend that their subsequent promotions and receipt of increased periodic salary payments amount to the continuing result of the conspiracy and nothing more. In support of this argument, the defendants rely upon the testimony of Gerald W. Clemente, Jr., the chief government witness and fellow co-conspirator, who said he was only interested in money for examinations.

The government counters that the scope of the conspiracy included the promotion of the defendants to an upper level position within the respective police department and the concomitant benefits of the promotion, particularly an increase in salary and status. The government argues that the receipt of increased periodic salary payments constituted overt acts of an essentially continuing conspiracy. In effect, according to the government, the purpose to gain benefits at the expense of defrauding the Commonwealth was advanced each time the defendants accepted their paychecks. The government analogizes this case to those wherein courts have held that a "conspiracy continues until the coconspirators receive their anticipated economic beneifits." *United States v. Mennuti,* 679 F.2d 1032, 1035 (2d Cir.1982).

1. *Scope of the Conspiracy*

Conspiratorial agreements may be proven by circumstantial as well as direct evidence. *United States v. Drougas,* 748 F.2d 8, 15 (1st Cir.1984) (citing *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 [1942] ). " 'A common purpose and plan may be inferred from a development and a collocation of circumstances.' " *Id.* (quoting *Glasser,* 315 U.S. at 80, 62 S.Ct. at 469). In the instant case, the evidence was more than sufficient for the jury to find, as is alleged in the indictment, that the defendants conspired to gain access to the promotional examinations, be promoted, and thereby reap the benefits of increased salaries. Contrary to the assertions of defense counsel, the direct testimony of Gerald W. Clemente, Jr. does not contradict this interpretation of the scope of the conspiratorial agreement. Gerald Clemente only testified to his motivation for soliciting potential users of examinations, namely greed. It is reasonable to infer, however, that Clemente also desired to have those to whom he sold examinations be promoted to positions of influence. Such a result could only benefit his marketing scheme as well as provide him access to people in power.

From the defendants' point of view, it is absurd to contend that they sought only an advance examination. It is beyond peradventure that they would desire all that is attendant to a successful examination, including the stature, allure, and economic benefit of a high ranking position within a police department. As was stated by the First Circuit Court of Appeals in a similar context,

The purpose of the conspiracy here was not to secure an opportunity for a qualified person to discharge gratuitously the duties of an office under [the Commonwealth of Massachusetts], but through fraud and deception to avoid the requirements of the law in respect to qualifications, and to secure, without such examination as the law and governmental reg-

---

**25.** The defendants, of course, dispute that they entered into any such agreement(s) whatsoever. In light of the jury verdicts to the contrary, however, they advance the above argument.

**26.** The indictment in this case was returned on July 29, 1986, more than five years after each of these events.

ulations require, *the privileges, immunities, and emoluments of an office for the duties of which the person was not qualified, the chief incentive and leading idea, of course, being to secure the statutory pay intended by the government as compensation for an official answering the requirements and qualifications of the law;* and in this sense surely the object of the conspiracy had reference to money and property of the government.

*Curley v. United States,* 130 F. 1, 12–13 (1st Cir.) (defendant indicted and convicted for conspiring against the United States by agreeing to falsely impersonate another person at a civil service examination for the purpose of procuring an appointment as a letter carrier, a classified civil service position) (emphasis added), *cert. denied,* 195 U.S. 628, 25 S.Ct. 787, 49 L.Ed. 351 (1904).

The Court concludes that the jury could reasonably infer from the evidence that the defendants conspired to receive the "privileges, immunities, and emoluments," including most importantly the increased statutory pay, in their schemes with Gerald W. Clemente, Jr. For Clemente's part he received $3,000 in cash or services along with the knowledge and confidence that he had placed individuals in high ranking positions; individuals who may later have proven to be of continued value.[27]

### 2. Overt Acts

■ Courts have held consistently that a conspiracy continues until the conspirators receive their anticipated economic benefits. *See, e.g., United States v. Girard,* 744 F.2d 1170 (5th Cir.1984); *United States v. Mennuti,* 679 F.2d 1032 (2d Cir.1982). As a practical matter, each benefit constitutes an act in furtherance of the conspiracy serving to toll the running of the statute of limitations. The problem is in distinguishing between a continuing result of the conspiracy, *see Fiswick v. United States,* 329 U.S. 211, 216, 67 S.Ct. 224, 227, 91 L.Ed. 196 (1946) (continuity of the result of a conspiracy does not thereby create a continuing conspiracy), and acts done in furtherance of an ongoing, continuing conspiracy. The conspiracy here was to defraud the Commonwealth of the honest services of its police officers which included defrauding it of money in the form of increased salary payments. It could have been argued that the defendants violated their public trust and furthered the conspiracy each time they donned their uniforms and represented themselves as honest police officers. The government did not argue so broadly. It argued,[28] and the jury

---

**27.** Clemente testified that he extracted favors from the defendants Arthur J. Pino and John A. Deliere long after the sale of the examinations. In the case of Pino, Clemente sought his aid in determining the danger he was in after he became the prime suspect in the Depositor's Trust caper. In the case of Deliere the favor took the form of a bail order issued in 1982 which allegedly was intended to benefit Clemente's then girlfriend, a bail officer.

**28.** The defendants accurately note some potential inconsistency in the government's position that appears almost inherent in conspiracy prosecutions. *See generally Developments in the Law, Criminal Conspiracy,* 72 Harv.L.Rev. 920, 960–62 (1959) (discussing prosecutorial method of alternating between using continuing conspiracy theory or an enlarged scope of the conspiratorial agreement). The government advances two not entirely harmonious theories of the conspiracy. In the indictment, the government alleged that the respective defendants devised and participated in a scheme to defraud the Commonwealth and its citizens of, among other things, their right to the loyal and honest

services of the defendant police officers. As stated earlier, the defendants' periodic salary payments constituted the anticipated economic benefits from their participation in the illegal scheme to defraud. Subsumed within the indictment and fleshed out in the government's trial memorandum and memorandum in opposition to the defendants' motion to dismiss is an argument for a continuing conspiracy supported with citations to cases involving continuous conspiracies. Defense counsel argue that the government's position is in variance with the indictment in that a continuing conspiracy was not specifically alleged. The Court does not agree that there is a variance of form between the indictment and the evidence at trial. *See United States v. Smith,* 789 F.2d 196 (3d Cir.) (requiring variance coupled with prejudice for reversible error), *cert. denied,* — U.S. —, 107 S.Ct. 668, 93 L.Ed.2d 720 (1986); P. Marcus, *Prosecution and Defense of Criminal Conspiracy Cases* § 4.04 (1987) (reviewing cases for same proposition). Unlike the typical case where prejudice may be found, the government did not seek to prove more than one conspiracy where only one was alleged nor did it seek to prove a

agreed,[29] that each time the defendants received a salary payment for their undeserved promoted position they were continuing to perpetrate a fraud on the Commonwealth and deprive it of funds. Although the government's position extends the duration of the conspiracy considerably, this Court rules that is proper with respect to the scope of the agreement and is supported by the evidence. Further, it is not without at least tacit support in the case law.

In *Bramblett v. United States*, 231 F.2d 489 (D.C.Cir.), *cert. denied*, 350 U.S. 1015, 76 S.Ct. 658, 100 L.Ed. 874 (1956), the court addressed a claim that the defendant knowingly and willfully falsified a material fact, namely that he falsely submitted a person's name as being a secretary on government payroll, and then he proceeded to collect the compensation issued to the secretary. The Court analogized the situation presented to a conspiracy continuing over a period of time. The court stressed that each monthly disbursement and receipt of the compensation amounted to conduct in furtherance of the single scheme. Judge Bazelon, dissenting on the ground that the court interpreted the statute, 18 U.S.C. § 1001, too broadly, made an apt insight for this case when he noted that the prosecution would clearly have been proper had the government in *Bramblett* brought the case pursuant to 18 U.S.C. §§ 286 or 371, since

> [i]t is clear that Bramblett was engaged in a conspiracy to defraud the United States under 18 U.S.C. §§ 286 or 371

(1952); that the conspiracy was begun by his false designation of Mrs. Swanson as his clerk; *and that an overt act evidencing the conspiracy occurred each time she accepted a salary check.*

*Bramblett*, 231 F.2d at 493 (footnotes omitted) (emphasis added). Thus, Judge Bazelon assumed that each acceptance of a salary check amounted to an overt act in furtherance of the conspiracy. *Cf. United States v. Forszt*, 655 F.2d 101, 104 (7th Cir.1981) (no statute of limitations issue where single continuous plan of extortion in violation of the Hobbs Act involved multiple payments over a period of years).

Also consistent with this Court's approach to the scope and overt acts in furtherance of the conspiracy are the numerous opinions wherein circuit courts have held that payoffs or distributions of the proceeds of ill-gotten gain amount to overt acts within the statute of limitations period. *See, e.g., United States v. Girard*, 744 F.2d 1170, 1172–73 (5th Cir.1984); *United States v. Helmich*, 704 F.2d 547, 548–49 (11th Cir.), *cert. denied*, 464 U.S. 939, 104 S.Ct. 353, 78 L.Ed.2d 317 (1983); *United States v. Mennuti*, 679 F.2d 1032, 1035 (2d Cir.1982); *United States v. Walker*, 653 F.2d 1343, 1346–47 (9th Cir.1981), *cert. denied*, 455 U.S. 908, 102 S.Ct. 1253, 71 L.Ed.2d 446 (1982). Like the defendants in those cases, the defendant police officers continued to receive their "payoffs" through the receipt of the increased periodic salary payments up until the time of the indictment. Each such receipt constituted an overt act within the statutory period.[30]

subsidiary conspiracy to conceal so as to prolong the duration of the conspiracy as was rejected by the Supreme Court in *Grunewald* or *Krulewitch v. United States*, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949). Whether one views the conspiracy as continually resuscitating itself upon the disbursement and receipt of each salary payment or as one so broad in scope as to include all the future payments as anticipated economic benefits of the scheme to defraud is solely a matter of form since in either case the purpose to defraud is the same and the defendants were on notice of the government's theory from the outset. In any event, the evidence supports both views.

**29.** "The duration of a conspiracy for purposes of the statute of limitations is a fact question for

the jury." *United States v. Walker*, 653 F.2d 1343, 1346 n. 6 (9th Cir.1981) (citing *Koury v. United States*, 217 F.2d 387, 388 [6th Cir.1954] ), *cert. denied*, 455 U.S. 908, 102 S.Ct. 1253, 71 L.Ed.2d 446 (1982).

**30.** *Cf.* Note, *Conspiracy, Concealment and the Statute of Limitations*, 70 Yale L.J. 1311, 1342 & n. 177 (1961) ("All that must be shown is that the supposed overt act stemmed from the agreement; it may be wholly innocent in itself.") (citing *Braverman v. United States*, 317 U.S. 49, 53, 63 S.Ct. 99, 101, 87 L.Ed. 23 [1942] ). The government has argued in the alternative, in the cases against Arthur J. Pino and John A. Deliere, that there are independent overt acts apart from the receipt of salary payments which satis-

Accordingly these defendants' motions for a new trial or judgment of acquittal on the theory that the government failed to bring the indictment within the statute of limitations were denied.

## IV. CONCLUSION

For the reasons expressed above, the petition of Frank Ray for a writ of habeas corpus is DENIED. Upon reconsideration, the motion of Nelson E. Barner for a new trial as to Count I of the indictment against him is ALLOWED and the sentence imposed upon him on Count I is VACATED. His other post-trial motions are DENIED. The post-trial motions of each of the other defendants are, upon reconsideration, DENIED in their entirety.

fy the statute of limitations requirements. The Court cannot accept this argument for the simple reason that it charged the jury that the receipt of periodic salary payments was sufficient for purposes of the statute of limitations. This Court also charged that the jury had to be unanimous in its decision as to what constituted the overt act in each count alleging conspiracy. See Note, *Right to Jury Unanimity on Material Fact Issues: United States v. Gipson*, 91 Harv.L.Rev. 499 (1977). If receipts of salary payments were not to constitute overt acts as the jury charge instructed, there would be no way to know upon what basis the jury found an overt act within the statutory period and the challenged verdicts as to each of the defendants Robert W. Clemente, Sr., Pino, and Deliere would have to be set aside and, at a minimum, Robert W. Clemente, Sr. would be entitled to a directed verdict of acquittal on Count V.