UNITED STATES of America, Plaintiff,

v.

**Thomas E. KEANE, Defendant.**

**No. 74CR359.**

United States District Court,
N.D. Illinois, E.D.

Dec. 7, 1987.

Helene L. Greenwald, Asst. U.S. Atty., Chicago, Ill., for Government.

Jerome H. Torshen, James K. Genden, Torshen, Schoenfield & Spreyer, Ltd., Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

DECKER, District Judge.

On October 9, 1974, Alderman Thomas E. Keane ("Keane") was convicted of mail fraud and conspiracy to commit mail fraud. Nearly thirteen years later, in an unrelated case, *McNally v. United States*, — U.S. —, 107 S.Ct. 2875, 97 L.Ed.2d 292 the United States Supreme Court held that the mail fraud statute does not prohibit schemes to defraud citizens of their "intangible rights" to honest and impartial government. Keane now petitions for a writ of error *coram nobis*, and requests that his conviction be vacated and his record expunged.

### I. *Factual Background*

On May 2, 1974, a twenty-one-count indictment was returned against Keane alleging mail fraud, in violation of 18 U.S.C. § 1341, and conspiracy to commit mail fraud, in violation of 18 U.S.C. § 371. ¶ 12 of the indictment accused Keane of devising and intending to devise "a scheme and artifice to defraud":

(a) The City of Chicago and its citizens and THOMAS E. KEANE'S fellow Aldermen on the Council of the City of Chicago of their right to the conscientious, loyal, faithful, disinterested and unbiased services, decisions, actions and performance of official duties by defendant THOMAS E. KEANE, in his official capacities as 31st Ward Alderman and as Chairman of the Committee on Finance of the City Council, free from corruption, partiality, wilful omission, bias, dishonesty, official misconduct, conflict of interest and fraud;

(b) The City of Chicago and its citizens, and THOMAS E. KEANE'S fellow Aldermen on the Council of the City of Chicago, of their right to have the City's business and its affairs conducted honestly, impartially, free from deceit, craft, trickery, corruption, fraud, undue influence, dishonesty, conflict of interest, unlawful obstruction and impairments, and in accordance with the laws of the State of Illinois and the City of Chicago, which said scheme and artifice to defraud is set forth more fully below.

¶¶ 13–31 of the indictment alleged the substantive details of the scheme. Based on the jury's verdict, the court convicted Keane on seventeen of twenty mail fraud counts, and on the conspiracy count. The Court of Appeals affirmed the conviction as to fourteen of the mail fraud counts, and also upheld the conviction for conspiracy. *United States v. Keane*, 522 F.2d 534 (7th Cir.1975), *cert. denied*, 424 U.S. 976, 96 S.Ct. 1481, 47 L.Ed.2d 746 (1976). Keane paid a fine, served a term of incarceration, and was subsequently released. The Seventh Circuit's opinion includes a comprehensive discussion of the facts underlying this case. The court now recapitulates the important facts, and notes the respective paragraphs of the indictment in which they were alleged.

Keane participated secretly in a scheme to purchase tax delinquent properties in Cook County, arrange for the Chicago City Council ("Council") to remove encumbrances thereon, and then engineer the City of Chicago's ("City") acquisition of many of these properties.

First, Keane established land trusts with several partners as a front for his investment. Indictment, ¶¶ 13–18, 22–24. In June and July, 1966, the trust purchased 1,878 parcels of tax delinquent property at a total cost of $208,543. 522 F.2d at 540; Indictment, ¶ 21. Next, Keane had to re-

move the special assessment liens on these properties.[1] Indictment, ¶¶ 25–28. It was thus necessary to cause foreclosure proceedings to be instituted by the City in the Circuit Court of Cook County. It was up to a subcommittee of the Council Finance Committee, which Keane chaired, to set the minimum bid, and in practice the court would approve the minimum bid as the price of the lien. 522 F.2d at 540. One of Keane's partner's discussed their need for foreclosures with the chairman of the subcommittee, who subsequently held a meeting on June 26, 1970. Although, prior to this meeting, the chairman had traditionally set minimum bids at thirty percent or more of the principal due, almost all of the thirty-two parcels in which Keane had an interest were assigned minimum bids of about ten percent. Id., at 540–541.[2] Chairman Keane submitted these minimum bids (as well as Compromise Offers) to the full Council for approval and voted on them without ever disclosing his personal interest. Id., at 541.

In the final phase of the scheme, Keane engineered the sale of the properties, typically to a governmental agency of the City. Indictment, ¶¶ 29–31. In May, 1968, Keane voted in the Council to authorize the Chicago Housing Authority ("C.H.A.") to purchase certain properties notwithstanding the fact that he had an equitable interest in them. 522 F.2d at 542. One of Keane's partners testified that Keane called the Chairman of C.H.A., Charles Swibel, and requested him to buy some of the properties. C.H.A. eventually bought sixty parcels. Id. C.H.A. also acquired five parcels as purchasing agent for the Chicago Dwelling Association ("C.D.A."). C.D.A. requested the purchase because it was Charles Swibel's wish. Id. C.D.A. obtained the lots even though they were not in an area approved by the Council, they were improperly zoned, and their per unit

cost was more than twice what C.D.A. normally paid. Id.

With respect to 102 other parcels in which Keane had an interest, the Metropolitan Sanitary District ("M.S.D.") threatened to condemn them and offered $150 per parcel. M.S.D. representatives met with Keane and indicated than the top appraisal was $700 per parcel. M.S.D. ultimately purchased the lots for $775 per parcel. 522 F.2d at 542. In addition, Keane voted in the Council to authorize the Department of Urban Renewal ("D.U.R.") to purchase property where Keane and his partners owned thirty parcels. The Government introduced evidence that Keane had purchased the parcels originally only because he had inside information about an impending D.U.R. project. Id., at 542–543; Indictment, ¶¶ 19–20. Keane also obtained inner-office correspondence of the Park District to facilitate sales to that agency in 1972. 522 F.2d at 543. Finally, Keane and his partners sold some properties to private parties as well. Id. The Government introduced evidence that the partnership's sale of the properties yielded a gross profit of $167,471.30. Id. Keane countered with evidence that he sustained a net loss of $26,032.07. Id., at 544.

In giving its instructions to the jury, the court discussed the substance of the scheme alleged in the indictment, and stated, *inter alia,*

It is not necessary, however, that the City of Chicago was actually defrauded by the scheme or suffered a monetary loss, nor is it necessary that the Government must prove all of the pretenses, representations and acts charged in the indictment. I should add that it is not necessary, however, not only that the City of Chicago was not actually defrauded or suffered a monetary loss but also so far as the citizens or any agency of the City of Chicago, it is not necessary

---

**1.** Special assessments finance local improvements, such as alleys and sewers, which benefit the adjacent properties. The adjacent property owners pay into a special assessment fund ("the fund"), which is used to redeem the bonds issued to contractors. 522 F.2d at 540.

**2.** In the case of properties whose special assessment bonds had already been redeemed by the fund, the subcommittee used a standard formula to assign a "Compromise Offer in Lieu of Foreclosure" ("Compromise Offer"). 522 F.2d at 541.

to show that they suffered a monetary loss.

Trial Transcript ("Transcript") at 3420.

## II. *Discussion*

18 U.S.C. § 1341 provides in pertinent part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, ... for the purpose of executing such scheme or artifice or attempting so to do [uses the mails or causes them to be used], shall be fined not more than $1,000 or imprisoned not more than five years, or both.

Federal prosecutors have long used this statute to bring to justice public officials at all levels of government who abuse the public trust for personal gain. Recently, however, in *United States v. McNally,* ——— U.S. ———, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), the Supreme Court undercut the theoretical foundation on which many prosecutions, including the instant case, have been built.

In *McNally,* one of the defendants became chairman of the Kentucky state Democratic Party, and thus obtained *de facto* control over selecting the state's insurance agent. He continued the state's relationship with a particular company in exchange for that company's sharing of its commissions with certain other companies, including one in which the chairman had an ownership interest. 107 S.Ct. at 2877. In affirming the conviction (*United States v. Gray,* 790 F.2d 1290 (6th Cir.1986)), the Sixth Circuit relied on the theory that § 1341 proscribes schemes to deprive citizens of their "intangible rights" to honest and impartial government. 107 S.Ct. at 2879. The Supreme Court reversed, holding that "[t]he mail fraud statute clearly protects property rights, but does not refer

to the intangible right of the citizenry to good government." *Id.*

Keane now contends that because he was tried for the deprivation of intangible rights, his conviction is a nullity.[3] The Government maintains, basically, that under the laws of agency, Keane's loyal service as an alderman was itself a valid property right, that survives *McNally,* and therefore the conviction should stand. Keane replies that the Government has been searching desperately for a lower court to narrow *McNally,* and thus, the Government has submitted its generic brief that would magically transform all intangible rights into the Supreme Court's notion of substantial property.

The Supreme Court stated that the words "to defraud" " 'usually signify the deprivation of something of value by trick, deceit, chicane or overreaching.' " 107 S.Ct. at 2880–2881 (quoting *Hammerschmidt v. United States,* 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924)). *McNally* is bound to leave lower courts somewhat bewildered. The citizens of Kentucky were "deceived," and this deception was for the "deprivation of something of value." Nevertheless, the scheme as a whole did not constitute mail fraud. To the extent the Kentucky scheme involved property—as the Supreme Court defines this term—*McNally* serves to tighten up the concept of "victim." That is, to constitute fraud, the entity to be deceived must *also* be the entity that is to part with property.[4] Therefore, there was no mail fraud proved in *McNally* because the entity deceived—the citizenry of Kentucky—was not deprived of property, and the entity deprived of property—the insurance company—although arguably extorted or "shaken down," was not, in the strict sense of the word, deceived. 107 S.Ct. at 2882.

---

**3.** As appears to be the case in *McNally,* 107 S.Ct at 2882, Keane's conspiracy count piggybacks on his conviction for mail fraud. Therefore, the former will stand or fall with the latter.

**4.** Since the gravamen of the statutory offense is a "scheme to defraud," it was unnecessary for

the Government to allege or prove that the victim of the scheme was actually defrauded or suffered a loss. *See United States v. George,* 477 F.2d 508, 512 (7th Cir.), *cert. denied,* 414 U.S. 827, 94 S.Ct. 155, 38 L.Ed.2d 61 (1973).

Although *McNally* does not recognize the deprivation of "intangible rights" as fraud, neither does it foreclose prosecution for the deprivation of so-called "intangible property." *See Carpenter v. United States*, —— U.S. ——, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987). In *Carpenter*, petitioners were convicted, in part, of mail fraud for misappropriating prepublication information of The Wall Street Journal regarding impending stock market activity. They used this information to buy and sell securities for their own personal gain. In upholding the convictions, the Court stated that

> ... the object of the scheme was to take the Journal's confidential business information—the publication schedule and contents of the "Heard" column—and its intangible nature does not make it any less "property" protected by the mail and wire fraud statutes. *McNally* did not limit the scope of § 1341 to tangible as distinguished from intangible property rights.

*Id.*, at ——, 108 S.Ct. at 320. *See also Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1001–1004, 104 S.Ct. 2862, 2871–2873, 81 L.Ed.2d 815 (1984) (confidential business information is property for purposes of Fifth Amendment's Takings Clause).[5]

■ The court is faced initially with the limited question of whether Keane's indictment expressly charged an actual offense. The Government has raised the question, discussed in *Runnels* and *Mandel*, of whether the fiduciary duty of an agent is the property right of his principal. However, the court need not reach it here because the indictment charged, and the evidence showed, that Keane schemed to deceive the citizenry and to deprive it of what is unquestionably property: money and/or confidential government information.

When, having purchased the land parcels, Keane obtained extraordinarily low minimum-lien-foreclosure bids from his own Council committee, submitted them to the full Council, and voted to approve them without disclosing his direct, pecuniary interest, he deceived the citizenry to deprive it of money.[6] The Government alleged this portion of the scheme in ¶¶ 13–18, 21–28 of the indictment. As the Court of Appeals found,

> ... there can be no question that defendant's properties were treated preferentially, and thus Keane [sic] who was in a fiduciary position [sic] was voting to approve minimum bids applicable to his properties, while at the same time the City Council did not see fit to grant similar percentages to properties belonging to other members of the public.

522 F.2d at 548 n. 21. The Seventh Circuit also acknowledged that the scheme depended upon Keane's efforts to "affirmatively mislead" his fellow aldermen as to his personal interest. *Id.*, at 549.

¶¶ 19–20 of the indictment alleged that Keane made use of confidential government information in his selection of land parcels. The jury heard evidence of such misappropriation of information with respect to an impending D.U.R. project. 522 F.2d at 542–543. If Keane misappropriated inside information, he again deprived the citizenry of property, "intangible" though

5. Without seeking leave of the court to cite additional authority, the Government brought "to the Court's attention" *United States v. Runnels*, 833 F.2d 1183 (6th Cir.1987). In *Runnels*, a lawyer bribed a union official to refer union members to his practice for workers' compensation claims. The Sixth Circuit upheld the official's conviction, despite an "intangible rights" instruction, by reasoning that the official's loyalty as a fiduciary of the union was the union's *property, and the bribe thus* represented an "economic benefit" of which the union was defrauded. An even more recent case to the contrary is *United States v. Mandel*, 672 F.Supp. 864 (D.Md.1987). There, the governor of Maryland took bribes to influence racetrack legislation, and, along with five co-defendants, was convicted of mail fraud on an "intangible rights" instruction. To prevent the issuance of a writ of error *coram nobis*, the Government argued in part that the bribe money "belonged to the State under a constructive trust-type theory." *Id.*, at 877. District Judge Smalkin rejected this theory on the grounds that it was never argued to the jury, and vacated the conviction.

6. Although the special assessment fund, into which foreclosure bids were paid, did not strictly involve funds of the City, the fund itself was a tool of the City's, and, therefore, property of the citizenry. 522 F.2d at 540, 550.

it might have been. *See Carpenter,* —— U.S. ——, 108 S.Ct. at 320.

■ The indictment further charged that, to consummate his scheme, Keane used inside information, and secretly pressured various City agencies and officials into purchasing his properties. *See* Indictment, ¶¶ 29–31. The evidence showed that in the case of the sales to C.D.A. in particular, Keane pressured officials into buying parcels that were improperly zoned, grossly overpriced, and outside the area approved by the Council. 522 F.2d at 542, 551. As in the case of the foreclosure bids, Keane also voted in the Council, to authorize City purchases of his own properties, without disclosing his interest in them. Thus, in disposing of the parcels, as well as in obtaining them, Keane deceived the citizenry to deprive it of money, and thereby defrauded it of property, as charged in the indictment. Furthermore, the possibility that Keane sustained a net loss from the entire scheme is immaterial to his guilt. § 1341 proscribes merely using the mails pursuant to a fraudulent scheme, whether or not the scheme is successful. *George,* 477 F.2d at 512. Keane's shortcomings as a "businessman" do not cleanse him of criminal culpability.

Finally, it is necessary to consider the effect, if any, of the court's now erroneous jury instruction on intangible rights. The United States District Court for the District of Massachusetts faced a similar dilemma in the wake of *McNally. See United States v. Doherty,* 675 F.Supp. 726 (D.Mass.1987). In *Doherty,* several of the defendants, who were Massachusetts policemen, devised a scheme to steal police examinations from the Commonwealth, and to sell them to policemen seeking promotions. With respect to the mail fraud count (the defendants were indicted for various offenses), the court instructed the jury, *inter alia,* that "[t]he object of the scheme need not be money or any form of tangible property." *Id.,* at 732. Nevertheless, the purpose of the scheme had been to deprive the Commonwealth of property: the examinations *per se,* as well as money raises to be paid to fraudulently promoted

officers. *Id.,* at 735–36. As the *Doherty* court observed, in gauging the impact of *McNally* on the guilty verdict,

> It borders on the absurd ... to infer as to these defendants that the jury—necessarily accepting the government's evidence in order to find each of the elements charged beyond a reasonable doubt—nevertheless disbelieved the equally probative evidence that an essential concomitant of these schemes was that the Commonwealth would be defrauded of money or property in accordance with the dictates of *McNally.*

*Id.,* at 735. Therefore, the *Doherty* court found its intangible rights instruction "harmless beyond a reasonable doubt." *Id.*

■ Similarly, in the instant case, the jury's verdict that Keane violated the citizenry's rights to loyal service necessarily contained an implicit finding that Keane deprived the citizenry of property. The indictment, in ¶¶ 13–31, as well as the jury instructions, Transcript at 3407–3411, defined Keane's disloyalty as a scheme to defraud the City of property. The court was careful, both at the outset of the trial *and* in giving its instructions, to explain the details of the scheme alleged in the indictment. Transcript at 57–63, 3407–3411. Despite the "intangible rights" instruction, the jury, as instructed, could have convicted Keane only if it believed beyond a reasonable doubt that Keane schemed to defraud the citizenry of (1) money payable to redeem special assessment liens on the properties he had acquired, Transcript at 3409–3410; (2) inside information regarding impending government projects, Transcript at 3408; and/or (3) money paid by various City agencies to Keane's partnership for its respective properties, Transcript at 3410–3411. The Government originally attempted to prove a deprivation of property by establishing Keane's civic disloyalty; it is readily apparent that the Government could only establish Keane's civic disloyalty by proving his scheme to defraud the citizenry of money and/or inside information. Therefore, the jury necessarily found a deprivation of property suffered by the entity deceived,

and this would meet *McNally*'s conception of fraud, as proscribed by the mail fraud statute.

The court's erroneous instruction on intangible rights was harmless beyond a reasonable doubt, and the conviction must stand. To vacate Keane's conviction in the wake of *McNally* would be to provide him with an unintended and unnecessary judicial windfall.

### III. *Conclusion*

Keane's petition is denied.